Willow River Club vs. Wade.

WILLOW RIVER CLUB, Appellant, vs. WADE, Respondent.

*April 15 — June 23, 1898.*

*Navigable rivers: Right of fishing.*

1. Willow river, in St. Croix county, an unmeandered tributary of the Mississippi, capable in times of high water of floating logs and small rowboats,— although at other times rowboats cannot be taken up the stream without dragging or pushing them on the bottom in numerous shallow places,— is *held* to be a public navigable stream.
2. Although the title to the bed of a navigable stream is in the riparian owners, yet the right to fish in such a stream is a right common to the public, and one who keeps within the limits of the stream may exercise such right without being guilty of trespass.

APPEAL from a judgment of the circuit court for St. Croix county: W. F. BAILEY, Judge. *Affirmed.*

Willow River Club vs. Wade.

For the appellant there were briefs by *Baker & Haven*
and *N. H. Clapp*, and oral argument by *Mr. Clapp.* They
contended, *inter alia*, that in the rivers of this state, espe-
cially small streams like the Willow river, the rule of the
common law obtains as to the right of fishery. Such waters
are private waters except as against the public right of float-
ing logs. The water and the soil thereunder and the right
to fish therein are capable of private ownership and belong
to the owner of the land. They are not the property of the
state or of the whole people, and the people have no rights
in such streams except the right to float logs where the
stream is capable of such use. The fact that such small
streams may be used for floating logs does not in any degree
impair or detract from the right of fishery which belongs to
and is vested in the riparian proprietor. The right of the
public to use the stream for the passage of logs or small boats
is entirely exclusive and limited in its nature and does not
give the public any authority to interfere with or disturb
the rights of the riparian owner, except so far as is absolutely
necessary to the exercise of the limited right of passage along
said stream with logs and small boats. 3 Kent, Comm. (13th
ed.), 411; Gould, Waters (2d ed.), § 182; Angell, Water-
courses, 70. The owner of both banks of a stream is the
owner of the bed, and the owner of one bank owns the bed
of the stream to the center of the current, and this applies
to streams that are meandered as well as to those which
are unmeandered. *Jones v. Pettibone*, 2 Wis. 308, 319, 320;
*Mariner v. Schulte*, 13 id. 692; *Walker v. Shepardson*, 4 id.
486; *Arnold v. Elmore*, 16 id. 509, 514; *Olson v. Merrill*, 42
id. 203; *Delaplaine v. C. & N. W. R. Co.* id. 214; *Norcross v.
Griffiths*, 65 id. 599, 608; *Janesville v. Carpenter*, 77 id. 288,
300; *A. C. Conn Co. v. Little Suamico L. M. Co.* 74 id. 652,
656, 658; *Barney v. Keokuk*, 94 U. S. 324. " The right of
fishing and fowling upon such water is in the owner of the
soil which is under the water." *Ne-pee-nauk Club v. Wilson*,

96 Wis. 290. The only modification of the common law in
this state is that the term "navigable" is applied in a quali-
fied sense to streams upon which logs can be floated from
the forest to market. Except as against this qualified and
limited right the common law obtains in its full vigor; and
while this court recognizes the existence of an easement in
the public to pass logs down small streams in this state to
market, it most carefully and explicitly guards every other
common-law right of riparian owners. *Walker v. Shepard-
son*, 4 Wis. 486; *Delaplaine v. C. & N. W. R. Co.* 42 id.
214, 224; *Janesville v. Carpenter*, 77 id. 288; *Allen v. Weber*,
80 id. 531; *Reysen v. Roate*, 92 id. 543; Gould, Waters,
§ 191; *Bigelow v. Shaw*, 65 Mich. 341. Confusion has re-
sulted and is likely to result from using the word "navi-
gable" in different senses — from calling small inland rivers
"navigable," and then jumping to the conclusion that all
the qualities attach to them which the common law gave
to tide waters. All that is decided in the case of *Olson v.
Merrill*, 42 Wis. 203, and other similar cases, is that rivers
capable of floating the wealth of the state to market are en-
titled to be considered for that purpose public waters, usable
for commerce as of public right. The Michigan court has
guardedly said that such rivers are "floatable" instead of
"navigable," and this term very aptly expresses what is
clearly the rule in this state. Obviously such rivers are not
navigable in the common-law sense, and obviously, when
this court has called such rivers "navigable," it has not at-
tached to them by that fact the *status* of tide waters at com-
mon law. This is completely proven by the decisions of this
court, holding that the riparian owner's title extends to the
center of the stream and is complete for all purposes except
as against the public rights of navigation. See *Sterling v.
Jackson*, 69 Mich. 511; *Grand Rapids v. Powers*, 89 id. 108–
111. According to the common law, land under inland riv-
ers, the water itself, and the fishing right therein were sub-

ject to private ownership and belonged to the owners of the adjacent shores. *Hardin v. Jordan*, 140 U. S. 371; Hale, De Jure Maris, Cap. I. (in appendix to Hall, Seashore); Co. Litt. 4*a*, 5*b; Mackenzie v. Bankes*, 3 App. Cas. 1324; *Bristow v. Cormican*, id. 641; *Freary v. Cooke*, 14 Mass. 488; *Comm. v. Chapin*, 5 Pick. 199; *Comm. v. Alger*, 7 Cush. 96; *Blood v. N. & L. R. Corp.* 2 Gray, 137; *Paine v. Woods*, 108 Mass. 160; *Lorman v. Benson*, 8 Mich. 18; *Sterling v. Jackson*, 69 id. 488; *Hooker v. Cummings*, 20 Johns. 90; *Brookhaven v. Strong*, 60 N. Y. 56; *Cobb v. Davenport*, 32 N. J. Law, 369; *S. C.* 33 id. 223; *Beckman v. Kreamer*, 43 Ill. 447; *McCullough v. Wall*, 4 Rich. Law, 68; Gould, Waters, §§ 48, 51, 93*a*, 184, 185, 204; *Hall v. Alford*, 72 N. W. Rep. 137. The authority is overwhelming that acquiescence however long continued in public fishing in private property is not a dedication to the public and does not operate to give the public rights by custom or by prescription. *Waters v. Lilley*, 4 Pick. 148; *Turner v. Hebron*, 61 Conn. 175. The significance of the fact that defendant came into our inclosure from a highway is not apparent. Either the exclusive right of fishing upon this land belongs to the plaintiff or it does not. If it does, it is entirely immaterial whether defendant in wrongfully usurping that right comes on a public highway or in a balloon. His coming into our inclosure and remaining there against our protest for an unlawful purpose is a trespass. It is a fundamental principle controlling the use of all highways that no person other than the owner of the fee can make any use of such highway except for the purpose of passing and repassing. Elliott, Roads & S. 310, 536; *Adams v. Rivers*, 11 Barb. 390.

For the respondent there was a brief by *John W. Bashford, James A. Frear*, and *S. J. Bradford*, and the cause was argued orally by *Mr. Bashford* and by *C. E. Whelan*, of counsel. They argued, among other things, that if a river is capable in its natural state of being used for pur-

poses of commerce, no matter in what mode that commerce may be conducted, it is navigable in fact, and becomes a public river or highway, although its navigation may be encompassed with difficulties by reason of natural barriers. *The Montello*, 20 Wall. 430; *Wis. River Imp. Co. v. Lyons*, 30 Wis. 61; *Olson v. Merrill*, 42 id. 203; *Brown v. Chadbourne*, 50 Am. Dec. 641; *Thunder Bay R. B. Co. v. Speechly*, 31 Mich. 341; *Burroughs v. Whitwam*, 59 id. 279; *Falls Mfg. Co. v. Oconto River Imp. Co.* 87 Wis. 134. In the case of a navigable river, the bed of the river is a public highway of the state and within its absolute control. *Smith v. Gould*, 59 Wis. 644; *Black River Imp. Co. v. La Crosse B. & T. Co.* 54 id. 680, 682. The bed or soil of navigable waters is held by the people of the state in their character as sovereign in trust for public uses for which they are adapted. *Ill. Cent. R. Co. v. Illinois*, 146 U. S. 387; *McLennan v. Prentice*, 85 Wis. 443–445; *Miller v. Mendenhall*, 19 Am. St. Rep. 219, and note; *Barney v. Keokuk*, 94 U. S. 324; *Ne-pee-nauk Club v. Wilson*, 96 Wis. 290. But, assuming that Willow river is nonnavigable, still, under the statutes of the territory and state of Wisconsin and the authorities, the defendant had a right to fish in said river. Terr. Stats. of 1839, p. 121; ch. 87, Laws of 1853; sec. 17, ch. 183, R. S. 1858; ch. 22, Laws of 1868; ch. 211, Laws of 1873; ch. 196, Laws of 1875; ch. 23, Laws of 1879; ch. 44, Laws of 1885. From the passage of the various acts relating to the control of the waters in the state and the fish therein, it is evident that the state has never released its ownership and control over the waters of the state and the fish therein, whether in streams, navigable rivers, or lakes. *Cole v. Eastham*, 133 Mass. 65, 68; 2 Dane, Abr. ch. 68, art. 6, § 1; *Nickerson v. Brackett*, 10 Mass. 212; *Comm. v. Chapin*, 5 Pick. 199; *Vinton v. Welsh*, 9 id. 87; Angell, Watercourses, § 85. The fish belong to the public, under subd. 1, sec. 11, ch. 221, Laws of 1895, and sec. 20, ch. 307, Laws of 1893, and prior acts. See *Cole v. Eastham*, 133 Mass.

65; *People v. Collison*, 85 Mich. 105; *People v. Bridges*, 142 Ill. 30; *State v. Roberts*, 59 N. H. 256; *Hooker v. Cummings*, 20 Johns. 91; *Lawton v. Steele*, 152 U. S. 133; *People v. Brooks*, 101 Mich. 98; *Comm. v. Perley*, 130 Mass. 469; *Minneapolis Mill Co. v. Board of Water Comm'rs of St. Paul*, 56 Minn. 485; *Black River Imp. Co. v. La Crosse B. & T. Co.* 54 Wis. 680–682; *State v. Welch*, 66 N. H. 178; *Comm. v. Gilbert*, 160 Mass. 157; *Comm. v. Follett*, 164 id. 477. The right of the legislature to control the subject of fisheries and riparian rights seems to have been completely disposed of by the United States supreme court in *Hardin v. Jordan*, 140 U. S. 371.

CASSODAY, C. J. This is an action for trespass to recover $20 damages for taking fish, commenced in justice's court. The defendant answered to the effect that he had a right to take the fish, and that the title to land would come in question, and gave the requisite bond, and the case was thereupon transferred to the circuit court, where the cause was tried.

It appears from the record, and is undisputed, that at the times mentioned the plaintiff was a legally constituted corporation, duly organized and existing under the laws of Minnesota; that May 31, 1896, the plaintiff was the owner and in the possession of the 200 acres of land described; that the Willow river was a stream or river, not meandered, flowing through and over said land and premises; that on or about June 1, 1896, the defendant, against the protest of the plaintiff and without its consent, entered upon said stream for the purpose of fishing therein, from the " John Kelley road," so called, a public highway which runs from John Kelley's premises to said Willow river at a point where it is upon the plaintiff's land, and from thence, by means of a boat, passed from said road upon and down said stream upon said premises in a boat, and from said boat, while the

same was upon said stream at the points above and below
said road, and within the boundaries of the premises de-
scribed, fished for, caught, and took with hook and line
from said stream, at said point on said stream, ten fish
called trout, of the value of one dollar, said fish then being
and swimming in the water of said stream, and did carry
said trout away, and applied them to his own use, against
the will and protest of the plaintiff, returning from said
Willow river by said road known as the "John Kelley road;"
that Willow river is about forty miles long in a direct line
from source to the mouth, but about seventy miles long
in the windings of the stream; that Willow River Falls is
about seven miles from the mouth of the river by a direct
line; that the point where the defendant entered upon the
river is about one and a half miles below the falls, and
within the back water of a dam erected about one half a
mile below, at Little Falls; that he entered upon the stream
from a public highway known as the "Kelley road," where
the river was 200 feet wide and from eight to ten feet deep;
that from the early settlement of the country until 1882
logs were driven down the river upon freshets and by the
aid of dams to St. Croix Lake; that after 1865 millions of
feet of logs were so driven each year, but that since 1882
logs had only been driven down the stream to New Rich-
mond, eighteen miles above the mouth of the river in a
direct line; that in the year 1895, 5,000,000 feet had been
driven down to New Richmond; that below the main falls
is a succession of rocky rapids; that persons had been up
the river from Hudson to the falls several times in small
rowboats, once in 1853, and again in 1868; that in going
over the rapids below the falls they used their oars as poles,
and pushed from the bottom; that it was, and always had
been, impossible, except in times of high water, to get up
the stream as far as the main falls in an ordinary rowboat,
without dragging or pushing it on the bottom of the river

Willow River Club vs. Wade.

in numerous shallow places; that several streams flow into Willow river below New Richmond and above the falls; that Ten Mile creek flows in below New Richmond, and runs a thirty-inch wheel, which furnishes power for a grist-mill at Boardman; that there is thirty to forty per cent. more water below the falls than above and at a point above the point of the alleged trespass; that, at an ordinary stage of water in the river, the narrowest place below the falls was thirty-three feet in width; that the average width, according to measurement taken, was fifty feet; that at a point where it was fifty feet wide the depth was from sixteen to forty-two inches; that at a point where it was 132 feet wide the depth was from four to twenty-five inches; that at Kelley's ford, where the trespass is alleged to have been committed, the river is 200 feet wide, and from eight to ten feet in depth; that wangans, bateaux, canoes, and rafts had been run down the river as early as 1855 and 1857; that the state had stocked the Willow river with thousands of trout during each of the years 1885 to 1892, inclusive; that there were no screens or nettings inclosing or bounding the stream so as to close the fish upon the land and premises described; that fish for miles up and down the stream were at liberty to go on and off the premises without hindrance or obstruction.

At the close of the evidence the court directed a verdict in favor of the defendant, and from the judgment entered thereon plaintiff brings this appeal.

The precise question presented by the facts stated is whether the defendant, by stepping from a public highway into a boat upon the river, and while floating thereon, catching the fish in question from the river by hook and line, committed a trespass upon the premises of the plaintiff. The proper solution of the question depends upon the proper determination of one or more other questions discussed at the bar. Counsel for the plaintiff is undoubtedly correct in

claiming that at common law the public right of fishery in rivers was confined to such portions of the rivers as were covered by the ebb and flow of the sea, and that the right of fishing in fresh-water rivers was exclusively in the abutting landowners. Thus, it is held, in quite a recent case, that "the public cannot, by prescription or otherwise, obtain a legal right to fish in a non-tidal river, even though it be navigable." *Smith v. Andrews* [1891], 2 Ch. Div. 678. One of the grounds given for such distinction between fresh and salt water rivers is that the title to the bed or soil under each of such tidal rivers is in the British crown. The public lands in the thirteen original states, respectively, were, of course, originally granted by the crown directly, by way of charters, patents, or otherwise, to chartered governments, to provincial establishments, to proprietary governments,— as to William Penn and to the Duke of York,— or to individuals; and then, upon the breaking out of the Revolution and the organization of each of the colonies into a separate and independent state, confirmed by the treaty of peace in 1783, the title to such lands as were not held by private tenure, together with all the powers of sovereignty, the prerogatives and regalities which had previously either belonged to the crown or to parliament, became immediately and rightfully vested in such state, since there was no national government until several years afterwards. *Martin v. Waddell*, 16 Pet. 416. See, also, *Den v. Jersey Co.* 15 How. 426; *Smith v. Maryland*, 18 How. 71; *Cooper v. Telfair*, 4 Dall. 14; *Smith v. Maryland*, 6 Cranch, 286; *Danforth's Lessee v. Thomas*, 1 Wheat. 155; *Owings v. Speed*, 5 Wheat. 420; *Shively v. Bowlby*, 152 U. S. 1. It was perfectly natural, therefore, for the thirteen original states, whose shores were washed by the Atlantic, as the shores of Great Britain were washed by the seas, to apply the English common law, and hold, as a general rule, that beds of tidal rivers belonged to the state, but that the beds of fresh-water rivers belonged to the abut-

ting landowners. *Smith v. Maryland*, 18 How. 71. And yet in some of those states the courts extended the common-law rule, applicable only to tidal rivers, to certain navigable fresh-water rivers. Subsequently, when the national government was framed and organized, and as a part of the general plan of the same, Virginia ceded the Northwest Territory, including what is now Wisconsin, to the United States, and thereafter all lands acquired became the property of the federal government. The United States has only parted with such title by specific grants, patents, pre-emptions, and other modes of conveyance and transfer. The rulings of the courts in the original states, and perhaps a failure in some cases to fully appreciate the difference in the source of title to land in the new and old states, seem to have led to more or less confusion, if not conflict, in the decisions of state courts, as to whether the title to the beds of navigable fresh-water rivers was in the state or in the abutting landowners. Some of the new states, and probably most of them, hold that such title is vested in the state, regardless of the ebb and flow of the sea. *Shively v. Bowlby*, 152 U. S. 2. This court has held from the beginning that the owners of the bank of a navigable stream by purchase from the United States, even when meandered, were presumed to be such owners to the middle of the stream in front of such purchase. *Jones v. Pettibone*, 2 Wis. 308; *Walker v. Shepardson*, 2 Wis. 384; *S. C.* 4 Wis. 486; *Mariner v. Schulte*, 13 Wis. 692; *Arnold v. Elmore*, 16 Wis. 509; *Wis. River Imp. Co. v. Lyons*, 30 Wis. 61; *Wright v. Day*, 33 Wis. 260; *Olson v. Merrill*, 42 Wis. 203; *Norcross v. Griffiths*, 65 Wis. 599; *Janesville v. Carpenter*, 77 Wis. 288. Of course, such owners take and hold such title for the use of the public. The only utterance to the contrary in this court is a suggestion of Chief Justice Dixon in the *Lyons Case*, which Chief Justice Ryan characterized as a *dictum* based upon a former *dictum* of the federal court, but which had thereafter been corrected in that

court.  *Olson v. Merrill*, 42 Wis. 210, 211.  In the last fed-
eral case thus referred to, Mr. Justice BRADLEY, speaking for
the court, said that " by the common law such additions [ac-
cretions] to the land on navigable waters belonged to the
crown; but, as the only waters recognized in England as
navigable were tide waters, the rule was often expressed as
applicable to tide waters only, although the reason of the
rule would equally apply to navigable waters above the flow
of the tide,— that reason being that the public authorities
ought to have entire control of the great passageways of
commerce and navigation, to be exercised for the public ad-
vantage and convenience.  The confusion of navigable with
tide waters, found in the monuments of the common law,
long prevailed in this country, notwithstanding the broad
differences existing between the extent and topography of
the British island and that of the American continent. . . .
Whether, as rules of property, it would now be safe to change
these doctrines where they have been applied, as before re-
marked, is for the several states themselves to determine.
If they choose to resign to the riparian proprietor rights
which properly belong to them in their sovereign capacity,
it is not for others to raise objections."  *Barney v. Keokuk*,
94 U. S. 337, 338.  The views thus expressed have frequently
since been sanctioned.  *Packer v. Bird*, 137 U. S. 661, 671;
*Hardin v. Jordan*, 140 U. S. 371, 382; *Kaukauna Water Power
Co. v. Green Bay & M. Canal Co.* 142 U. S. 254; *Eldridge
v. Trezevant*, 160 U. S. 466.  In these cases it is held that'
" whatever incidents and rights attach to the ownership of
property conveyed by the United States, bordering on navi-
gable streams, will be determined by the states in which it
is situated, subject to the limitation that their rules do not
impair the efficacy of the grant, or the use and enjoyment
of the property by the grantee."  "Grants by the United
States of its public lands bounded on streams and other
waters, made without reservation or restriction, are to be

construed, as to their effect, according to the law of the state
in which the lands lie." " In Wisconsin the ownership of ripa-
rian proprietors extends to the center or thread of the stream,
subject, if such stream be navigable, to the right of the pub-
lic to its use as a public highway for the passage of vessels;
and the law, so settled by the highest court of the state, is
controlling in this court as a rule of property." To the same
effect, *Shively v. Bowlby*, 152 U. S. 40. On the contrary, the
riparian proprietor upon navigable lakes and ponds takes the
land only to the water's edge. *Delaplaine v. C. & N. W. R.
Co.* 42 Wis. 214; *Priewe v. Wis. State L. & I. Co.* 93 Wis. 546.

In the case at bar it is conceded that the plaintiff owned
the land on both sides of the stream, and hence has title to
the bed of the stream. But the mere fact that the title
to the bed of the stream is in the plaintiff is not necessarily
conclusive that the plaintiff has title to the fish in the river.
As indicated, at common law the public right of fishing in
rivers was confined to such portions of the rivers as were
covered by the ebb and flow of the sea. The reason why
the public rights terminated, and the private rights began,
just where the waters of the river ceased to be impregnated
with salt and were entirely fresh, might be difficult to ex-
plain, were it not for the fact that the admiralty jurisdiction
of the English courts over such rivers was also limited to
such tidal waters; and, as stated in the portion of the opin-
ion of Mr. Justice Bradley in *Barney v. Keokuk* quoted
above, " the only waters recognized in England as navigable
were tide waters, . . . although the reason of the rule
would equally apply to navigable waters above the flow of
the tide," upon which commerce might be carried on. Long
prior to that decision, Chief Justice Taney, in an able opin-
ion, said: " There is certainly nothing in the ebb and flow
of the tide that makes the waters peculiarly suitable for ad-
miralty jurisdiction, nor anything in the absence of a tide
that renders it unfit. If it is a public navigable water, on

which commerce is carried on between different states or
nations, the reason for the jurisdiction is precisely the same;
and, if a distinction is made on that account, it is merely
arbitrary, without any foundation in reason, and, indeed,
would seem to be inconsistent with it. . . . In England,
therefore, tide water and navigable water are synonymous
terms, and tide water, with a few small and unimportant
exceptions, meant nothing more than public rivers as con-
tradistinguished from private ones, and they took the ebb
and flow of the tide as the test because it was a convenient
one and more easily determined the character of the river.
Hence the established doctrine in England that the admiralty
jurisdiction is confined to the ebb and flow of the tide; in
other words, it is confined to public navigable waters. . . .
In the old thirteen states the far greater part of the naviga-
ble waters are tide waters; and in the states which were at
that period in any degree commercial, and where courts of
admiralty were called on to exercise their jurisdiction, every
public river was tide water to the head of navigation. And,
indeed, until the discovery of steamboats, there could be
nothing like foreign commerce upon waters with an un-
changing current resisting the upward passage. The courts
of the United States, therefore, naturally adopted the Eng-
lish mode of defining a public river, and consequently the
boundary of admiralty jurisdiction. It measured it by tide
water. . . . The description of a public navigable river
was substituted in the place of the thing intended to be de-
scribed." *The Genesee Chief v. Fitzhugh*, 12 How. 454, 455.
The learned chief justice clearly shows that to adhere to the
letter of the English definition, and ignore its spirit, would
be to exclude from admiralty jurisdiction, not only most of
the great rivers of this country, but also the great lakes,
which he aptly characterizes as " in truth inland seas."

The doctrine of that case, to the effect that the admiralty
jurisdiction of the federal courts, as granted by the consti-

tution, is not limited to tide water, but extends wherever vessels float and navigation successfully aids commerce, has since been repeatedly approved and affirmed. *The Hine v. Trevor*, 4 Wall. 555; *In re Garnett*, 141 U. S. 14, 15. In *Barney v. Keokuk*, 94 U. S. 338, Mr. Justice BRADLEY said that "the confusion of navigable with tide water had the influence for two generations of excluding the admiralty jurisdiction from our great rivers and inland seas; and, under the like influence, it laid the foundation in many states of doctrines with regard to the ownership of the soil in navigable waters above tide water at variance with sound principles of public policy." Such jurisdiction is constantly being exercised over the navigable rivers of the country, including those of Wisconsin. And so the supreme court of the United States, in an able opinion by Mr. Justice FIELD, has expressly held that "the doctrine of the common law as to the navigability of waters has no application in this country. Here the ebb and flow of the tide do not constitute the usual test, as in England, or any test at all, of the navigability of waters. The test by which to determine the navigability of our rivers is found in their navigable capacity. Those rivers are public navigable rivers in law which are navigable in fact. Rivers are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." *The Daniel Ball*, 10 Wall. 557. That case was expressly approved in a later case, where it was held that, "if a river is not of itself a highway for commerce with other states or foreign countries, or does not form such highway by its connection with other waters, and is only navigable between different places within the state, then it is not a navigable water of the United States, but only a navigable water of the state." *The Montello*, 11 Wall. 411–415; *S. C.* 20 Wall. 430–439. This last case arose on

the Fox river, in this state, which originally was not fitted for useful commerce, but only navigated by Durham boats; and it was held that the navigability of a stream does not depend upon the mode by which commerce is conducted upon it, nor upon the difficulties attending the navigation, but upon the fact whether the stream, in its natural state, is such as to afford a channel for useful commerce.    Mr. Justice DAVIS, writing the opinion of the court in that case, said that the Fox river was one of the highways referred to in, and secured by, the Ordinance of 1787, and which was expressly confirmed by act of Congress of August 7, 1789 (1 Stats. at Large, 50).    The provision of the fourth of the "articles of compact," contained in that Ordinance, and sec. 3 of the enabling act of Congress for the admission of this state into the Union, is copied almost literally into our state constitution, where it is declared that "the river Mississippi and the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the state, as to the citizens of the United States, without any tax, impost or duty therefor."    Const. Wis. art. IX, sec. 1.    This provision is certainly broad enough to include all streams leading into the two great rivers therein mentioned.

It is true that Willow river was not meandered, and the question recurs whether, from the undisputed evidence, we can say that it was a navigable stream within the principles of law mentioned, and especially the decisions of this court. It has frequently been held that the rivers of this state, capable of floating the products of the country — such as logs and rafts of lumber — to mill or market, are common public highways.    *Whisler v. Wilkinson*, 22 Wis. 572.    That rule was applied to the Kickapoo river, which was not meandered. *Id.*    The same rule was applied to the Yellow river, which was not meandered.    *Sellers v. Union Lumbering Co.* 39 Wis.

Willow River Club vs. Wade.

525. The same rule was applied to Levis creek, an unmean-
dered stream. *Olson v. Merrill*, 42 Wis. 203. In that case
it was held, in addition, that "it is not essential to the pub-
lic easement that this capacity be continuous throughout the
year, but it is sufficient that the stream have periods of nav-
igable capacity ordinarily recurring from year to year, and
continuing long enough to make it useful as a highway." In
that case authorities were cited to the effect that persons
floating logs upon the stream might, when necessary for that
purpose, go upon the banks of the stream without being
guilty of trespass. *Treat v. Lord*, 42 Me. 552; *Knox v.
Chaloner*, 42 Me. 150; *Veazie v. Dwinel*, 50 Me. 479. In
respect to that question, Chief Justice RYAN said: "We are
not, however, inclined fully to follow that class of cases.
. . . We take it that a stream which is of sufficient
capacity to float logs is of sufficient capacity to float some
kind of boat or skiff, in which the owner may follow his
logs. And if there be some places where, in consequence
of bars or other obstructions, neither logs nor boat will pass
without human help, the boat may be aided down the stream
as well as the logs, so that the logs may be floated through
the stream without trespass on the banks. This might prob-
ably be inconvenient, and even sometimes dangerous. But
a stream is none the less navigable because persons using it
are induced by inconvenience to prefer unlawful to lawful
means in aid of the use." 42 Wis. 213. The right to drive
logs or lumber down a public navigable stream would seem
to include the right to do the things essential to facilitate
the drive, so long as the drivers keep within the limits of the
stream. The same rule as to what constitutes a public nav-
igable river has been applied to the Little Wolf river and
the Little Suamico river, neither of which is meandered.
*Weatherby v. Meiklejohn*, 56 Wis. 73; *A. C. Conn Co. v. Little
Suamico L. M. Co.* 74 Wis. 652. Upon the undisputed evi-
dence and the adjudications mentioned, we must hold that

the Willow river is a public navigable stream, fitted for use-ful commerce and transportation of persons and property thereon. Being such, it necessarily follows, from the prin-ciples of law stated, that, notwithstanding the plaintiff has title to the bed of the river, nevertheless it holds the same in trust for the use of the public.

The question recurs whether the public right of fishery is included in, or an incident of, such public right of naviga-tion. In other words, Has the plaintiff, as riparian owner, the exclusive right to take fish from the river? The plaint-iff certainly has no property in the particles of water flow-ing in the stream, any more than it has in the air that floats over its land. Its rights in that respect are confined to their use and to preserving their purity while passing. *Lawson v. Mowry*, 52 Wis. 234, 235. So, the fish in the stream were not the property of the plaintiff at common law, any more than the birds that flew over its land. *State v. Roberts*, 59 N. H. 256; Angell, Watercourses (7th ed.), § 65a, and cases there cited; *State v. Welch*, 66 N. H. 178. As indicated, the public right of fishery in tidal rivers was maintained, at common law, in England, before the use of steam,— when vessels could only be carried up the river by the flow of the sea, and down the river by the ebb of the sea,— and conse-quently when the ebb and flow of the tide practically meas-ured the navigability of the stream. For the same reason, the public should have the right to fish in all the public navigable waters of the state, including all public navigable rivers and streams of the state. The supreme court of the United States, in a recent case, partially adopting the lan-guage of the New Hampshire case cited, has declared that, "at common law, the right of fishing in navigable waters was common to all. The taking and selling of certain kinds of fish and game at certain seasons of the year tended to the destruction of the privilege or right by the destruction con-sequent upon the unrestrained exercise of the right. This

Willow River Club vs. Wade.

is regarded as injurious to the community, and therefore it is within the authority of the legislature to impose restriction and limitation upon the time and manner of taking fish and game considered valuable as articles of food or merchandise. For this purpose fish and game laws are enacted. The power to enact such laws has long been exercised, and so beneficially for the public that it ought not now to be called into question." *Lawton v. Steele*, 152 U. S. 138, 139. In this state the legislature has expressly declared that " all fish in the public waters of the state of Wisconsin are hereby declared to be the property of the state and may be taken for the use of the individual and become his property at any time and in any manner not prohibited by the laws of this state." Laws of 1893, ch. 307, sec. 20. Public navigable streams are certainly "public waters," within the meaning of that act. Since the defendant kept within the banks of the river,— within the limits of the public highway,— his fishing was nothing more than the exercise of a right common to the public. We must hold that the Willow river was a public navigable stream, and the defendant was not guilty of trespass by going upon it, as he did, catching the fish in question.

*By the Court.*— The judgment of the circuit court is affirmed.

PINNEY, J., dissents.

MARSHALL, J. I concur with the decision of the court, but regard the opinion of the chief justice as being so framed as to lead to the belief that the common right of fishing in navigable streams in this state is a mere incident to the right of navigation, and that defendant is not liable because he was navigating the stream in a boat at the time of the act complained of; in short, that he was where he had a right to be in the exercise of the right of navigation, and there-

fore that he was not a trespasser upon the plaintiff's lands. In my judgment the right of fishing in navigable waters is common to all, and exercisable, so far as it can be done without trespass on the banks thereof, whether the person exercising such right be at the time navigating the stream in a boat or otherwise floating upon the surface of the water, or traveling upon the bed in the shallows, or anywhere in any manner, between the lines of ordinary high-water mark. That is, that the common-law doctrine of navigable waters, with all the incidents and characteristics of such waters, has been extended to include all streams navigable in fact, through the location of the title to the beds of such streams in the state originally for that very purpose, and that though such title, by force of state policy, has passed from it to private ownership, such ownership is of such a qualified character as not to in any way interfere with the character of the streams as public waters; not public in the sense of such rivers as at common law were merely subject to the right of passage, but public by the common-law test of navigability. A right of passage exists at common law in many rivers, and they are yet, for all other purposes, private. So, it does not squarely meet the question here, to say that there is a common right of fishing because of a common right of navigation; for while the former cannot exist without the latter, the latter can without the former. That is, by the rules of the common law, one is not necessarily incident to the other. Rivers navigable in fact, though not tidal, are private except subject to the right of passage. Said the court in *Adams v. Pease*, 2 Conn. 481: "As far as the tide ebbs and flows a river is public, both as to the right of fishing and navigation; above its tidal character it is private, except so far as it is navigable in fact, and to that extent it is public for that purpose only." Said SPENCER, C. J., in *Hooker v. Cummings*, 20 Johns. 90: "The common law considered a stream where the tide ebbs and flows as naviga-

---

---

ble, and devoted to the public for all purposes, as well for navigation as for fishing; and other streams as navigable, but not so far belonging to the public as to divest the owners of the adjacent banks of the exclusive right of fishing therein."

So it will be clearly seen that to merely hold that the bed of a stream navigable in fact is subject to the easement of the public for that purpose, does not sustain the common right of fishing therein. Either a stream navigable in fact is public for all purposes, the same as tidal waters at common law, or the common right of fishing therein does not exist. Obviously, if the mere right of passage exists, it would no more follow that a person can stop by the way and fish or hunt, than that he can stop by the road side on a public highway and cut grass or wood, or do anything else not incident to the right of traveling thereon. That point has been many times decided, which is sufficiently shown by cases cited in the briefs of counsel in this case, notably that of *Sterling v. Jackson*, 69 Mich. 488, where the claim was that defendant was not liable as a trespasser while in a boat shooting wild fowls, though the land submerged by the water on which his boat rested belonged to the plaintiff, because it was navigable water. In regard to such contention the court said, in substance, defendant had no right to be there except for the purpose of navigating the water over the land; when he stopped for any other purpose, as to shoot ducks, he abused his privilege and became a trespasser. Several cases are cited by the Michigan court, sustaining the position that the mere fact that a person is where he has a right to be on a navigable stream, if exercising the right of navigation, does not protect him if he does anything not incident to that right.

The foregoing makes it quite clear, in my judgment, that the right of public fishing cannot be sustained as a mere incident to the right of navigation, and that the opinion of the

chief justice hardly goes far enough to bring out clearly the
true character of navigable streams in this state as public
waters.

It would be uninteresting, after all the chief justice has
said, to go over at length the history of the common-law doc-
trine as to public and private streams, the location of the title
to the beds of such streams, the reason therefor, to what
extent such doctrine has been adopted in this country, and
the peculiar reasons for the divergence of opinions of, and
apparent conflicts between, different courts, so I shall content
myself with general statements and few references to au-
thorities, leading up to the conclusion that all navigable
streams of this state were designed originally to be public
for all purposes, and that their character in that regard has
not changed, notwithstanding the state has, for some pur-
poses, parted with the title which was vested in it, in its
sovereign capacity, in trust for the preservation and protec-
tion of public interests.  If the state had not surrendered
any of its interests in such lands, but kept the same till the
present time, solely for the use for which the same came to
it at its organization, the question we now have before us
would never have arisen.  It would then be conceded with-
out question, by all, that the title to lands under all naviga-
ble water within the boundaries of the state is in the state,
and such waters public in the same degree as waters navi-
gable at common law by the test of tidal character.

All the trouble and confusion regarding the public right
of fishing in navigable streams has grown out of the fact
that the title to the beds of such streams has been so gen-
erally declared, without qualifying words, to be in the ripa-
rian owner, that the real origin thereof, and the real nature
of the private ownership, have come to be overlooked, and
a mere qualified private title, consistent with the trustee ca-
pacity of the state for the public purposes of navigation and
fishing, to be looked upon as an absolute title resting on, or

having all the qualities of, an absolute grant, or at least a grant subject to the right of passage, a title such as the riparian proprietor possessed on a private stream at common law, and such as is held by riparian proprietors on fresh-water streams in New Hampshire, New Jersey, and most of the original thirteen states of the Union, where, as said by the chief justice, the common law, with some exceptions, prevails.

It is conceded that by the English rule the title of riparian proprietors on navigable streams extends only to ordinary high-water mark; that the title below that line is in the sovereign in trust for the benefit of the public; that as to land bordering on other streams the title extends to the thread thereof; and that navigable streams are only such as are affected by the tides without reference to navigability in fact. An examination of the subject under discussion will show that, whatever changes have taken place in regard to public waters, the principle has been uniformly maintained that, where the absolute ownership of the beds of navigable streams is private, such streams are held not to be public for any purpose; and so far as streams which, by the rules of the common law, were private are now deemed to be public, the title to their beds is in the state, or subject to that use, in harmony with the public rights, the same as at common law. The fiction of navigability tested by the tidal character of water has been rejected, and the test of navigability in fact substituted in place of it, only in harmony with the status of the title to the beds of the streams. In most of the original states the grants to private persons covered the beds of fresh-water streams, so the common-law doctrine almost necessarily prevailed there from the start. In New York, the court, in *Hooker v. Cummings*, 20 Johns. 90, held that the original grants on fresh-water streams conveyed to private owners the lands between the margins, with the exclusive right of fishing. That is quoted from extensively

by appellant, as supporting the private character of the stream in question, overlooking the fact that it rests wholly on the mistaken theory that the original grants to private persons conveyed the submerged land, which was overruled later, and which is not true as to such lands in this state, as will be hereafter seen. In *People ex rel. Loomis v. Canal Appraisers*, 33 N. Y. 461, the court reviewed all the cases on the subject previously decided in that state, and reached the conclusion that streams navigable in fact were navigable in law, with all the common-law incidents thereof, and that the private ownership of lands on such streams stopped at ordinary high-water mark. In reference to *Hooker v. Cummings, supra*, the court said, in substance, that the court rendering the decision held that he who owns the soil of a fresh-water stream has *prima facie* the exclusive right of fishing, entirely ignoring the fact of navigability or non-navigability, and that, with great respect for the high source from which that decision emanated, it was not sustained by principle or authority. The court said further, in effect, that the title to the beds of navigable streams, using the term "navigable" in the sense of navigable in fact, was originally vested in the state, and that the state had never parted with such ownership, thus harmonizing the title with the public character of the streams as at common law. In Pennsylvania, the same rule prevails, and upon the same ground, namely, that the title to the beds of all the principal rivers is vested in the state (*Carson v. Blazer*, 2 Bin. 475; *Shrunk v. Schuylkill Nav. Co.* 14 Serg. & R. 71); and the same is true in North Carolina (*State v. Pool*, 74 N. C. 402); also other states (*Home v. Richards*, 4 Call, 441; *Haight v. Keokuk*, 4 Iowa, 199; *Wood v. Fowler*, 26 Kan. 682). This court in *Ne-pee-nauk Club v. Wilson*, 96 Wis. 290, very recently held that the right of fishing must be in harmony with the ownership of the land under the water.

Without going further into the subject just discussed, it

Willow River Club vs. Wade.

must be conceded that the absolute private ownership of the bed of a navigable stream is inconsistent with its being public for any purpose; that if such be the nature of the riparian proprietor's title, or if it be subject only to the easement of navigation, then the exclusive right of fishing goes with such ownership.   So, if the situation of the title to lands adjacent to navigable streams is stated with strict accuracy in *Jones v. Pettibone*, 2 Wis. 308, to the effect that it extends to the thread of the stream, subject to the right of navigation, which statement has often been referred to and may be said to form the foundation of the doctrine that the state has parted with the title it formerly possessed to the beds of such streams, then they are private for the purpose of fishing. In my judgment, the condition of the title was not there stated with strict accuracy.   An examination of the opinion shows that the title, as to whether absolute or qualified, and if qualified, to what extent, was not before the court, and the fact herein shown, that the title to the beds of navigable streams in all the Northwestern Territory was reserved for public purposes, and, in that portion within the boundaries of this state, vested in it at its organization for such purposes, was entirely overlooked.   The observation was made, as in the decision in *Hooker v. Cummings*, 20 Johns. 90, by applying common-law principles as if the title to the beds of navigable streams were vested in the private owners of the banks by purchase and grant, as in case of fresh-water streams at common law.

From the foregoing it follows that the real nature of the riparian proprietor's title is the true test of the character of a navigable stream as public or private.   If private ownership to any extent exists, it did not proceed from the United States under its patents.   That has long been firmly settled. In *Barney v. Keokuk*, 94 U. S. 324, the court said that the beds of all streams navigable in fact vested in the new states upon their organization, and that if they chose to surrender

to riparian proprietors rights which properly belonged to them in their sovereign capacity, it is not for others to raise objections.   In *Railroad Co. v. Schurmeir*, 7 Wall. 272, it is said, in effect, that the right of the public in all rivers navigable in fact, and the title to lands under them, is the same as in respect to streams navigable by the common law; that the title to lands bordering on such streams, derived from the United States under its patents, goes only to the margin, because the title beyond that point was reserved to the state and vested in it when admitted into the Union.   Again, in *Yates v. Milwaukee*, 10 Wall. 504, the court said, in substance, that the private ownership of lands, formerly a part of the public domain, on navigable streams, stops at the margin thereof.   Again, in *Wright v. Day*, 33 Wis. 260, this court, citing the federal case of *Railroad Co. v. Schurmeir*, *supra*, said that the purchaser from the United States takes title from it to the margin of the stream or water's edge, and the unqualified title to the land above ordinary highwater mark.   In *Wis. River Imp. Co. v. Lyons*, 30 Wis. 61, referring to *Jones v. Pettibone*, 2 Wis. 308, the court harmonized it with the fact that the government patent conveys only to the margin, by saying that the title beyond the margin, being subject to the public easement of navigation, the mere location of it was of very little importance, the idea being that the state, though conceding the title to the beds of navigable streams to the riparian proprietor, concedes only such qualified title as does not militate against the character of the stream as public.   To the same effect, and more distinctly, is *Norcross v. Griffiths*, 65 Wis. 599, where Mr. Justice TAYLOR, speaking for the court as to the extent of the original grantee's title to the bed of a navigable stream by reason of purchase of the adjacent lands from the government, said that it was expressly decided in *Railroad Co. v. Schurmeir*, 7 Wall. 272, that the bed of a navigable stream is not conveyed by a patent of the United States

of lands adjoining it. Further, it is said in the opinion, that by force of state policy the riparian owner is conclusively presumed to own to the thread of the stream. No qualifying words are used; nevertheless the court evidently did not intend to say that the title of the riparian proprietor, by mere implication of law, is an absolute title, for that would be inconsistent with the right of navigation, and inconsistent with what was said in *Wis. River Imp. Co. v. Lyons, supra,* to the effect that the title of the riparian proprietor is subject to the public right of navigation, and being so subject, it is really immaterial whether the title is in the state or in the riparian proprietor.

So we are safe in saying that the title to the beds of all navigable streams of this state passed to the state from the United States with all the incidents of public waters at common law, including the right of fishing as well as navigation. By what means has that title since changed, if at all, so far as the public is concerned? It will not be claimed that the state has directly parted, or attempted to part, with its title, even if it could effectually do so. By what right, then, does the riparian proprietor claim title to the submerged lands under navigable streams, if not based on a direct grant from the general government or the state? The answer, and only answer, is, by force of state policy so long declared by the court and submitted to as to become a rule of property which has worked a conveyance, so far as it reaches, as effectually and conclusively as if the title rested in grant. Such title proceeded from the state, however, by force of its policy, as a concession to the holder of the patent title, and became appurtenant thereto upon such title being conveyed by the government,— a concession not resting for its validity on any direct act of the state through its legislative body, but on mere state policy as declared by the court and acquiescence therein for so long a time that it cannot be changed without working great hardship. Therefore, it is said that the conduct

of the state has created a rule of property which has all the effect of title by equitable estoppel. This court, in *Olson v. Merrill*, 42 Wis. 203, referring to the observation of the court by Mr. Justice BRADLEY in *Barney v. Keokuk*, 94 U. S. 324, to the effect that the rule adopted in some states, of conceding to riparian proprietors of navigable streams the title to the beds thereof, is at variance with sound principles of public policy, and expressing a doubt whether, as a rule of property, it would be safe to change the doctrine where long established, but that it was for the states themselves to decide whether they would surrender property rights belonging to them in their sovereign capacity, said, that left this state free to adhere to a policy which had been so long established that it would be mischievous to disturb it.

So the state now owns the beds of all navigable rivers between the lines of ordinary high-water mark on either shore, except in so far as the rule of property, established by state policy, has taken it away. If not taken away at all, no question as to the right of public fishing in such rivers would be raised, we may safely assume, as before stated. If not taken away, except subject to all the rights in common characteristic of public waters, then, as said by DIXON, C. J., in *Wis. River Imp. Co. v. Lyons*, 30 Wis. 61, it is quite immaterial whether the riparian owner's title be considered to extend to the center of the stream or stop at the margin, for his situation, and that of the public, in such circumstances, would be the same as in case of the private ownership of lands in a public highway. While it is said that the title to such lands extends to the center of the highway, that does not in any way interfere with the public use of the way, and so long as such public use is not interfered with, it is really immaterial where the legal title rests. It being understood all the time that the legal title is subject to the public use, its location with the adjacent owner, necessarily, is unimportant. So it may be said that the title of a riparian pro-

prietor, to lands bordering on a navigable stream, extends to the thread of the stream, perfectly consistent with the public character of the stream for navigation and fishing, if the title to the bed of the stream passed to such proprietor subject to such public use.

We have now reached in this discussion the point where it is necessary to determine the extent to which the state has surrendered its title to submerged lands originally vested in it, and at the threshold of that we should inquire as to the power of the state to surrender its trust. Obviously, the mere declaration of a fact by the courts, so long adhered to without challenge as to give it effect as a verity and a rule of property, can go no further than the state could go pursuant to legislative authority. That much would seem to be self-evident, and taking it as a correct statement of the law, several decisions of this court seem to have decisively settled the question to the effect that the beds of navigable waters, which were once vested in the state as a trust for public purposes, have not been, and could not be, parted with, except subject to that trust. In *McLennan v. Prentice*, 85 Wis. 427, this court said, on that subject, that the right which the state holds in these lands is in virtue of its sovereignty, and in trust for the public purposes of navigation and fishing, and it cannot abrogate its trust in relation to them. Again, in the very recent case of *Priewe v. Wis. State L. & I. Co.* 93 Wis. 534, the court laid down the same doctrine, quoting with approval from *McLennan v. Prentice, supra*, and said that any attempt by the state to convey absolutely lands submerged by navigable waters, so as to abrogate its trusteeship in respect to the same, would be void on its face, or subject to revocation; that if such were not the case the state might relinquish to private ownership its rights in all the numerous navigable lakes of the state. True, in both cases the court was speaking of the beds of lakes, but the title of the state to submerged lands under navigable waters,

whether of lakes or rivers, came to it at the same time, subject to the same incidents, and for the same purposes, and must necessarily be governed by the same rules.  It included the same ownership and dominion over all waters navigable in fact, and the lands under the same, which existed in sovereign power at common law.  That has been so often decided by the highest courts of this country that it is needless to do more than to refer to it.  If authority were wanting, the exhaustive opinion of Mr. Justice FIELD, in *Ill. Cent. R. Co. v. Illinois*, 146 U. S. 387, cited by this court in both of the cases above referred to, and by the chief justice here, leaves nothing further that need be said on the subject.  It shows clearly that all lands under navigable waters, which were formerly within the public domain, vested in the state for public purposes, and that the term "navigable waters" means waters navigable in fact; that to them, common-law principles relating to tidal waters, and the title to lands under the same, apply to the fullest extent.  Justice FIELD did not announce any new doctrine, but only elaborated and made plain a very old one.  In *Barney v. Keokuk*, 94 U. S. 324, the court said, in effect, referring to several previous decisions on the subject, that the Great Lakes, and other navigable waters of the country, above as well as below the flow of the tide, are in the strictest sense entitled to be denominated "navigable waters," with all the characteristics of tidal waters at common law.

We might proceed at great length, citing decisions of other courts to show that the trust capacity of the state in respect to the beds of navigable waters cannot be surrendered, either directly or indirectly, but as we have shown that this court has twice spoken decisively on the subject, we may safely rest the matter there.  The state may part with its title so far as the public interest is not interfered with, but no other disposition of it is valid.  See, further, the following: 3 Kent, Comm. 427; *Miller v. Mendenhall*, 43

Minn. 95; *Wilson v. Welch*, 12 Oreg. 353; *Pollard's Lessee v. Hagan*, 3 How. 212; *Den v. Jersey Co.* 15 How. 426; *Weber v. Board of State Harbor Comm'rs*, 18 Wall. 57.

Now we have seen that "navigable waters," as the term is applied here, includes all waters navigable in fact; that the title to all lands under such waters was vested in the state at the time of its organization, in trust to preserve the public character of such waters, and that such character is the same as that of waters navigable at common law; that whatever of such title the state has parted with has been surrendered, not by grant, but by mere force of state policy so long adhered to as to have the effect, as a rule of property, of vesting title in the riparian proprietor by implication of law; but that the state never possessed power to emancipate itself, directly or indirectly, from its trusteeship in such lands, except subject to the public purposes for which it was clothed with the title thereto. So, without questioning the doctrine that the title to lands adjacent to navigable streams extends to the thread thereof, obviously, it is a qualified title, because the state could not part with any other; and there is no sound reason to sustain the contention that any further surrender has been heretofore declared or attempted. The very fact that the judicial history of the state shows that the doctrine that the title of a riparian proprietor on a navigable stream goes to the center of the stream has been no more rigidly adhered to than that such title is subject to the public right of navigation, and that there is no declaration by this court, that can be pointed to, showing that the character of such streams, for any of the purposes incident to public waters, has been affected by any abdication by the state of its trusteeship for such purposes; and the further fact that from the earliest history of the state down to the present time the public right of fishing in such streams has been a subject of regulation by legislative enactment, is proof conclusive,

that for all the purposes of the trust for which the lands under navigable waters were vested in the state, the title thereto is still subject; and that only for such private purposes as do not interfere with such public purposes, has the title been surrendered to the riparian proprietors. That gives full effect to the rule of property by which it is said the riparian proprietor takes to the thread of the stream, within the legitimate limits of such rule. All the supposed mischiefs that might flow from a change in the rule are thereby avoided; the rule is given the full effect that it can legitimately have, to the full extent and spirit of the meaning of the decisions of this court upon which it rests; and all public rights are at the same time fully preserved, notwithstanding doubts have been cast upon the subject from the frequent unqualified, unguarded statements that occur in numerous cases in respect to the title of lands adjacent to navigable waters extending to the thread of the stream.

The foregoing doctrine, promulgated as the doctrine of this court and firmly adhered to, will, without injury to private rights and without overruling anything previously said by the court, enunciate clearly, and maintain consistently, the true doctrine that the waters of the state belong to the state, not for one public purpose only, but for all public purposes originally designed, and which should have been, and should be, most carefully guarded. It is open to serious doubt as to whether the surrender to private ownership of the property of the state in submerged lands, to any extent, was not a mistake. Certain it is that such title, in all territory out of which this and other northwestern states were carved, was vested in them in trust for public purposes of the highest importance, which have grown, and are likely to grow, as time continues. Probably, if such importance had been fully foreseen at the start, the state's interests would have been more rigidly and jealously guarded, and private ownership not been allowed to invade at all, either the pub-

Willow River Club vs. Wade.

lic title or the public use; certainly not, without considera-
tion, by mere operation of state policy judicially declared.
In Iowa, Kansas, California, and many other of the western
states, as we have heretofore seen, the public title of the state
to lands under navigable waters has been retained as it came
to them, in trust, at the time of their organization.    Said
BREWER, J., in *Wood v. Fowler*, 26 Kan. 682, " The generally
accepted rule in this country is, to apply the term 'navi-
gable' to all streams in fact navigable, and in such case to
limit the title of the riparian owner to the bank of the stream,
especially in the states where the lands have been conveyed
and patented under the federal law."    That is upon the
ground that the general government did not include in the
public surveys the beds of such streams, for the very reason
that the title thereto was reserved to the states for the pub-
lic purposes of navigation and fishing.    But, as said before,
so long as the public character of the water of such streams
is preserved, with all the incidents of the common rights of
navigation and fishing, it is not very material as to where
the legal title to the beds under them is located, any more
than it is as to where the title to land included in a public
highway is located, so long as the public use is not thereby
impaired.

To recapitulate in closing, the title to the beds of all navi-
gable waters in this state was in the state originally in trust
for public purposes, the same as the beds of streams navi-
gable at common law; the state not only never has, but never
can, legally abdicate that trust, or surrender such title, ex-
cept subject to all the public uses for which it was created;
and while it is true that the title to the beds of such streams
is in the adjoining landowners by implication of law, it is
just as true that such title is subject to the public character
of the waters, the same as if no surrender of title had ever
taken place.    The public right of navigation, and the public
right of fishing, both exist in such streams, each independ-

ent of the other, with the right to make the usual use of the beds of such streams within the margins thereof, necessary to the full enjoyment of such public rights.

BARDEEN, J. I concur in the foregoing opinion by Mr. Justice MARSHALL.