Whaley, Chief Justice,
delivered the opinion of the court:
This is a suit to recover for the loss of the power capacity of plaintiff’s dam on the Willow Eiver caused by the erection by the defendant of the Eed Wing Dam on the Mississippi Eiver. Plaintiff’s hydroelectric power plant was at the mouth of the Willow Eiver, which river empties into the St. Croix Eiver. The St. Croix is a tributary of the Mississippi Eiver and is a navigable stream. Plaintiff’s dam and power plant was on land owned by it above ordinary high water, but the tailrace from its plant emptied into the St. Croix Eiver below ordinary high water. As the result of the erection by the defendant of the Eed Wing Dam on the Mississippi Eiver the water level of the St. Croix Eiver was raised and backed up into plaintiff’s tailrace.
The case presents several issues, the first of which is whether or not the Willow Eiver is a navigable stream. If it is a navigable stream, then plaintiff’s rights in its dam and power plant were subject to the paramount right of the defendant to take all necessary measures to improve navigation. United States v. Chandler-Dunbar, 229 U.S. 53, 62; United States v. Chicago, Milwaukee, St. Paul, & Pacific Railroad Co., 312 U. S. 592, 595.
The Supreme Court of Wisconsin, in Willow River Club v. Wade, 100 Wis. 86; 76 N. W. 273, held that this river was a navigable stream. The Willow Eiver ran through the property of the plaintiff, Willow Eiver Club. The action was brought to recover damages alleged to have, been suffered by the plaintiff by the catching of fish in that'part of the Willow Eiver which ran through its property. Under the Wisconsin law, if the river was navigable, then the defendant had the right to catch fish in any part of the river, because the title to the bed of navigable streams was in the State. The court held that it was navigable and denied recovery. The stream was held to be navigable because the proof showed that a long time previously logs had been floated down the river in times of spring freshets. This was the only proof that the *227 river had ever been used, or in its natural state was capable of use, for commerce and the transportation of persons and property.
However, in a later case the Wisconsin Supreme Court rejected this as a test of navigability in a case involving the right of the defendant to construct a dam across one of the rivers of the State. The Mill Dam Act (chapter 146, Statutes of Wisconsin, 1898) permitted the erection of dams on non-navigable streams but prohibited their erection on navigable streams without the consent of the State. The proof in that case (Allaby, et al. v. Mauston Electric Service Co., 135 Wis. 345, 351; 116 N. W. 4, 6) showed that logs had been floated down the stream in question, but the court said:
* * * From these considerations we are constrained to the conclusion that the testimony which tended merely to show that this stream was so capable of floating logs that the public might be entitled to right of highway therein for that purpose was wholly insufficient to establish that it was navigable within the meaning of chapter 146.
The decision in this case weakens the authority of the decision in Willow River Club v. Wade, supra.
However, in a suit such as the one in the case at bar, navigability is a Federal question, and Federal courts are not bound by the decisions of State courts thereon. Economy Light & Power Co. v. United States, 256 U. S. 113, 123; United States v. Holt State Bank, et al., 270 U. S. 49, 56.
Under the decisions of the United States courts it is clear that the mere fact that logs are floated down a stream in times of high water does not make the river navigable in the sense that the United States under its commerce power has paramount rights in the stream in the interest of navigation. United States v. Rio Grande Dam and Irrigation Co., 174 U. S. 690, 698-699; United States v. Utah, 283 U. S. 64, 87.
There has been no decision of a Federal Court on the navigability of the Willow Eiver. Whether or not it is navigable is a question of fact. The Daniel Ball v. United States, 10 Wall. 557; United States v. Utah, supra.
We are clearly of the opinion that the Willow River is not a navigable stream in the sense that the United States may regulate commerce thereon. There is no commerce thereon to be *228 regulated and there never has been. The only transportation the river has ever afforded is to float down logs in times of spring freshets. Except at these times logs cannot be floated down the river. The river is but 40 miles long in a straight line and 70 miles long following its meanders. In some places it is so narrow that the branches of trees on one bank are interlocked with the branches of trees on the other bank. The depth of the water varies from 2 inches to 12 or 14 inches. Fencing extends across the stream in agricultural areas. The stream has never been meandered by the Government. Since the erection of dams by the plaintiff the pools created by them are used for recreational purposes only. The proof is entirely insufficient to show that the river in its ordinary condition or with artificial aids is suitable for commercial navigation. The Daniel Ball v. United States, supra; United States v. Appalachian Electric Power Co., 311 U. S. 377.
Liability of the defendant, therefore, depends upon whether or not the level of the St. Croix River was raised above ordinary high-water mark. It had a right to raise the level of the river to ordinary high-water mark with impunity, but it is liable for the taking or deprivation of such property rights as may have resulted from raising the level beyond that point. Kelley's Creek & Northwestern Railroad Co. v. United States, No. 44631, 100 C. Cls. 396, and cases there cited.
The proof shows clearly that the ordinary level of the St. Croix River was raised to 675 and a fraction feet. The plaintiff says that ordinary high-water mark before the level was raised was at elevation 672 feet, and the defendant says it was 676 feet. We are satisfied from the proof that it was not higher than 672 feet.
The plaintiff has introduced numerous photographs showing large trees standing in the water after the raising of the level. These are standing in depths of water varying from 1.2 feet to 4.7 feet. This was at a time when the level of the river was at its ordinary level of 675.3 feet. The defendant itself introduced hydrographs showing the levels of the river at Hudson, where plaintiff’s plant was, and at Stillwater, some miles upriver from plaintiff’s plant, *229 and at Prescott, where the St. Croix empties into the Mississippi. The hydrographs at Hudson begin in May of 1936. An examination of these hydrographs shows spring floods beginning in March or April and lasting through June and into July. After the subsidence of these floods these graphs show that the river maintained a level varying between 667 feet and 670 feet until the erection.of the Red Wing Dam on the Mississippi River on August 12, 1938, since which time the graphs show that the ordinary level of the river is at about 675 feet. In November of 1939 the gates in the Red Wing Dam were opened, and the graphs show that during the period they were open the level of the river fell from 675 feet to 672 feet. There is no doubt in our minds that plaintiff’s experts are correct in their testimony that the ordinary high-water mark before the erection of the Red Wing Dam did not exceed 672 feet.
The defendant says that it did not take any portion of plaintiff’s property, that it merely decreased the head of plaintiff’s dam, and that plaintiff is not entitled to recover therefor as for a taking. This position, however, is contrary to the decision of the Supreme Court in United States v. Cress, 243 U. S. 316, 329, 330. Two cases were discussed in that opinion. With reference to No. 718 the court said:
In No. 718 there is a contention that, because the backwater is confined to Miller’s Creek, it does not amount to a taking of land. But the findings render it plain that it had the necessary effect of raising the creek below the dam to such an extent as to destroy the power of the mill dam that was essential to the value of the mill; or, as the findings put it, “The water above the lock and dam, when it is at pool stage, is about one foot below the crest of the mill dam, which prevents the drop in the current which is necessary to run the mill.” Under the law of Kentucky, ownership of the bed of the creek, subject only to the natural flow of the water, is recognized as fully as ownership of the mill itself. The right to have the water flow away from the mill dam unobstructed, except as in the course of nature, is not a mere easement or appurtenance, but exists by the law of nature as an inseparable part of the land. A destruction of this right is a taking of a part of the land.
*230 The authority of this ease is somewhat weakened by the court’s opinion in United States v. Chicago, Milwaukee, St. Paul & Pacific R. Co., supra, in which the court said, “What was said in the Cress case must be confined to the facts there disclosed”; but the facts of that case on this point are identical with the facts here. The case has not been overruled and we have no option but to follow it. It results that plaintiff is entitled to recover the value of the decrease in the head of its dam.
The exact determination of that value is difficult from the proof introduced. We are furnished with involved calculations, such as we might expect and perhaps have a right to expect from engineers specializing in hydroelectric fields. But the amount of just compensation to be awarded may not include one factor to the exclusion of all others — it is a far more complex proposition than, say, the mere ascertainment of quotations on the exchange, usual returns on investments, or mathematical formulae. Hetzel v. Baltimore & Ohio R. Co., 169 U. S. 26; Standard Oil Co. v. So. Pacific Co., 268 U. S. 146; Eastman Kodak Co. v. Southern Photo Materials Co., 273 U. S. 359; Story Parchment v. Paterson Paper Company, et al., 282 U. S. 555.
Among the factors to be taken into consideration is such an amount as when capitalized at a certain percentage will produce yearly the revenue which plaintiff has lost by reason of the reduction of power caused by the backing up of water into the tailrace.
Taking all relevant proof into consideration, we have arrived at an amount of $25,000, by way of a jury verdict, as justly compensating the plaintiff for that which the defendant has taken from it, as of the time and place of taking, adding thereto and as a part thereof 4% percent per annum on $25,-000 from August 12, 1938, down to the date of payment of judgment.
Judgment is rendered accordingly. It is so ordered.
Madden, Judge; Whitaker, Judge; and Littleton, Judge, concur.
Jones, Judge, took no part in the decision of this case.