GREEN BAY & MISSISSIPPI CANAL COMPANY, Appellant, vs. TELULAH PAPER COMPANY and others, Respondents.

*October 5—October 26, 1909.*

*Mills and milldams: Navigable rivers: Flowage of lands: Limitation of actions: Prescription: Equitable actions: Statute construed: Lowering head at upper dam: Findings of fact: "Adverse" flowage: Landlord and tenant: Acquiring hostile title: Estoppel.*

1. The words "any milldam" in subd. 3, sec. 4221, Stats. (1898),— first enacted as ch. 184, Laws of 1862,—do not relate merely to dams across nonnavigable streams authorized by ch. 146, Stats.

1898 (ch. 56, R. S. 1858), but include a dam built across a navigable stream for the purpose of creating water power to operate mills.

2. A dam erected to create power to operate mills, which power is used exclusively for that purpose, is a milldam within the meaning of subd. 3, sec. 4221, Stats. (1898), although the corporation erecting it has no power itself to operate mills, but merely leases or sells the power to mill owners while retaining title to the dam itself.

3. Subd. 3, sec. 4221, Stats. (1898), has the effect to confer title at the expiration of the ten years within which an action for damages for the flowing of lands by a milldam must be commenced, and bars, therefore, an equitable action to restrain the maintenance of the dam as well as an action for damages.

4. The raising, by a milldam, of the water wholly within the banks of a river, thereby lowering the available head of the water at an upper dam and covering with a greater depth of water the bed of the river at and below the upper dam, is a flowing of the lands of the owner of such upper dam and river bed, within the meaning of subd. 3, sec. 4221, Stats. (1898).

5. A finding by the court that for a period of more than ten years the setting back of the water upon plaintiff's land by defendants' milldam had been "uninterrupted, continuous, open, notorious, and adverse, and so as to maintain on plaintiff's land the same water level in the same stages of water," covered all the elements necessary to render operative the bar of subd. 3, sec. 4221, Stats. (1898).

6. The word "adverse" in such a finding, while it embodies a conclusion of law, is also a comprehensive statement of an ultimate conclusion of fact embracing all the elements necessary to make possession adverse.

7. Proof that a milldam was completed in a certain year, without fixing the exact date, does not show that an adverse flowage of land thereby began before the last day of that year.

8. The fact that for a part of the ten years during which, as defendants claimed, the lands of plaintiff, the owner of an upper dam, had been flowed by means of a lower dam, the general manager of one of the defendants acted as principal manager of the lower dam and was also general manager of a corporation which had leased from the plaintiff certain amounts of water power from the upper dam and certain lots below that dam, did not prevent the flowage from being adverse to plaintiff during the whole of said ten-year period, in the absence of a showing that the property so leased from plaintiff was in any way interfered with or encroached upon by the setting back of

the water from the lower dam. The doctrine that a tenant cannot deny his landlord's title or acquire a hostile title while the tenancy continues has no application to such a case.

9. The fact that a dam across a navigable river is an unlawful structure because it obstructs the river without legislative authority, does not prevent the acquirement by prescription of the right to maintain such dam as against individual owners of lands above the dam.

APPEAL from a judgment of the circuit court for Outagamie county: CHESTER A. FOWLER, Judge. *Affirmed.*

For the appellant there were briefs by *Quarles, Spence & Quarles,* attorneys, and *George Lines,* of counsel, and oral argument by *Mr. Lines.*

For the respondents there was a brief by *Hooper & Hooper,* and oral argument by *Moses Hooper.*

WINSLOW, C. J. In February, 1892, the plaintiff corporation, which is the owner of the surplus water power not needed for navigation purposes created by the Grand Chute or government dam in the Fox river at Appleton, brought this action in equity against the defendants, who own the dam immediately below the plaintiff's dam, and known as the middle dam at Appleton, and the water power created thereby, to restrain the defendants from maintaining said middle dam at its present height, claiming that the same unlawfully *sets back the water of the river and flows the plaint-iff's lands* and water wheels to the depth of thirty inches. The trial court found that there had been, prior to the commencement of this action, ten years' uninterrupted and adverse user by the defendants of the said middle dam at the height at which it was maintained at the time of the commencement of this action, and thereupon dismissed the complaint, holding that the action was barred by subd. 3, sec. 4221, Stats. (1898), or, if not barred by this subdivision, then by subd. 4 of the same section. The plaintiff first contends that subd. 3, above mentioned, is not applicable

(a) because said section only applies to milldams across non-navigable streams, and the Fox river is in law a navigable stream; (b) because the said middle dam is not a milldam in the usual and ordinary sense; (c) because this is not an action to recover damages; and (d) because no flowing of lands is involved. We will take up these propositions in the order indicated.

1. The subdivision named places, among the actions which must be brought within ten years after the cause of action accrues, "An action for the recovery of damages for flowing lands, when such lands have been flowed by reason of the construction or maintenance of any milldam." This section first appeared upon our statute books in 1862 as ch. 184 of the laws of that year, where it read as follows:

"No action for the recovery of damages for the flowing of lands shall be maintained in any court in this state, when it shall appear that said lands have been flowed by reason of the construction or erection of any milldam for the ten years next preceding the commencement of such action: provided, any party shall have one year from and after the passage of this act in which to commence an action for the recovery of any lands, tenements or hereditaments heretofore flowed, or for the recovery of the possession thereof, or for damages to the same."

The argument is that when this act was passed the word "milldam" had acquired a technical and special meaning in our law by reason of the existence of ch. 56, R. S. 1858, entitled "Of mills and mill-dams" (now ch. 146, Stats. 1898), and that this special meaning was and is confined to dams authorized by said chapter, to wit, across nonnavigable streams, and that the subsequent re-enactment of the section in substantially the same words in the revisions of 1878 and 1898 as subd. 3, sec. 4221, in no way changes the original special meaning. Doubtless the result would follow if the major premise were correct. R. S. 1878, sec. 4985; Stats. (1898), sec. 4985. But we see nothing to indicate that the

legislature in passing ch. 184 of the Laws of 1862 intended to confine the provisions of the act to milldams erected under the provisions of ch. 56 across nonnavigable streams; on the contrary, the argument seems to be the other way.

The act is general in its terms, and purports to bar an action after ten years' flowage by "any milldam." A dam which is built across a navigable stream for the purpose of creating water power to operate a mill is just as certainly a milldam as one built across a nonnavigable stream. So by its language the act covers one as well as the other. Courts certainly should not be industrious in seeking out obscure or unusual meanings to attach to statutory expressions, when the words used are plain and unambiguous and the ordinary meaning is entirely reasonable. Now, had the legislature desired and intended to confine the act to dams erected and maintained under the milldam law (*i. e.* dams across nonnavigable streams), the most obvious and natural thing would be to say so in direct language, and add the section to ch. 56 of the Revised Statutes of 1858, thus completing the special code governing the erection and maintenance of this class of milldams. This seems the more certain when it is remembered that there were many milldams in the state across navigable streams which had been erected under special legislative acts, and also that the milldam law, while first enacted in 1840, was repealed in 1850 and not re-enacted until 1857. During this interregnum the session laws fairly teem with special acts authorizing the erection of milldams, none of which, of course, were milldams in the technical and special sense claimed by the respondents here. It seems probable that at the time this act was passed there were full as many dams in the state which had been built outside of the provisions of the milldam law as under it. Undoubtedly the legislature knew this fact, and, so knowing, passed a law applying generally to any milldam "in the state." Upon principle it would seem that under these circumstances this law, framed

in unambiguous, general words, must have an interpretation just as broad and general as the words used commonly receive. Furthermore, the question seems to have been decided adversely to appellant in the case of *Ruehl v. Voight,* 28 Wis. 153, where the owners of a dam on Rock river, erected by virtue of a special act of the territorial legislature of 1845, pleaded this statute, and upon this exact point the court said:

"The language of the statute is clear, precise, and comprehensive, and bars every action where the lands have been flowed for ten years without any claim for damages. The statute means this, or it has no meaning whatever."

It is true that in that case the act authorizing the dam made it subject to the provisions of the milldam law then existing, but the decision was not placed on this ground, but on the broad ground that the language covered "any milldam" or none.

In *Cobb v. Smith,* 38 Wis. 21, which was an action of flowage caused by a dam erected on a navigable stream under express legislative grant, this statute of limitations was pleaded; and while it was held that the pleading showed that the use had not been adverse, still the court treated the statute as applicable to such a dam had the facts been sufficient.

2. The claim that the middle dam is not a milldam within the meaning of the word as used in the statute is based on the fact that it was built by the defendant the *Applelon Water Power Company,* a corporation organized for the purpose of constructing this dam "and for improving and creating water power and river lots in and near said water power and for holding and disposing of the same," and the further fact that it has no power to operate mills and does not do so, but has sold or leased the power created by the dam in parcels to the various other defendants for mill purposes, while retaining title to the dam itself. The argument does not appeal to us very strongly. It seems that a dam erected to create power to operate mills, which power is used exclusively to operate

mills, is logically and truly a milldam, notwithstanding the ownership of the dam and of the mills may be in different persons. It is true that this court has held that ch. 184 of the Laws of 1862 only applies to "milldams in the proper and strict sense of the words," and that a dam which was part of and necessary to a general scheme for the improvement of the navigation of a river, so as to make it a public highway, was not properly a "milldam" within the meaning of the law, though the power created by it might be used to operate mills. *Arimond v. Green Bay & M. C. Co.* 35 Wis. 41. The rule there laid down seems reasonable, but we do not perceive that it is applicable to the present case.

3. We agree with appellant's contention that this is not an action to recover damages, but rather an equitable action to enjoin the continuance of a nuisance, with an incidental claim for damages, but we cannot agree with the conclusion drawn therefrom to the effect that the limitation statute does not therefore apply. It is true that the law in terms only prohibits the bringing of "an action for the recovery of damages for flowing lands" after the expiration of the ten-year period, but this court has held that the effect of this statute is to confer title after the ten-year user is complete, on the principle that where (as in Wisconsin) the statute of limitations destroys the right as well as bars the remedy, that result must follow. *Johnson v. Boorman,* 63 Wis. 268, 22 N. W. 514. This ruling effectively disposes of this contention.

4. The contention that there is no flowing of lands within the meaning of the statute in the present case is yet to be considered. It appears that the setting back of the water by the defendants' dam is wholly within the banks of the river, so that no lands outside of the banks are overflowed, but the dam raises the water within the banks so as to lower the available head of the water power furnished by plaintiff's dam. Is this truly a flowing of lands? We think it is. To

hold otherwise would be to engraft a very narrow and tech-
nical meaning upon the statute. The plaintiff owns the lot
upon the south side of Fox river upon which the south side
of its dam rests, and the land for some distance below, and
hence is a riparian owner. In this state the owner of a bank
of a navigable stream owns to the center line (unless the own-
ership of the bank and the bed has been separated), subject
only to the rights of the public. *Willow River Club v. Wade,*
100 Wis. 86, 76 N. W. 273. Hence the plaintiff owns the
bed of the river at and below its dam, subject only to govern-
mental and public rights. This bed is land. While ordi-
narily covered with water to some depth, the defendants' dam
has covered it with water to a greater depth and rendered it
less valuable to its owner. This is flowing of lands in every
true sense.

But the appellant further contends that, even if the statute
of limitations be applicable to such a case, the facts proven
do not bring the present case within the statute. It is un-
doubtedly true that the user must have been adverse for ten
years prior to the commencement of the action in order to
raise the statutory bar. The court found that the setting back
of the water by defendants' dam had been "uninterrupted,
continuous, open, notorious, and adverse, and so as to main-
tain on plaintiff's land the same water level in the same stages
of water" since the completion of the dam in 1877. These
words include all the elements necessary to render the statute
operative. If there were any doubt as to whether the words
"uninterrupted, continuous, open, and notorious" covered the
subject, that doubt would be removed by the addition of the
word "adverse," which, while it embodies a conclusion of law,
is also a comprehensive statement of an ultimate conclusion
of fact embracing all the elements necessary to make posses-
sion adverse. We are entirely satisfied from examination of
the record that the evidence fully justified the finding of the
court in this regard, and we deem it unnecessary to make any
review of such evidence.

But one contention which the appellant makes in this connection must receive attention. The contention is that the undisputed evidence shows that for a part of the ten years the possession and management of the defendants' dam was in the hands of a tenant of the plaintiff at the upper dam, and hence that the possession during such time could not be adverse because it was possession by plaintiff's tenant. The facts on which this claim is based are in brief as follows: The defendants' dam was completed some time in 1877, the exact date not being fixed by the testimony or the findings. Adverse holding under it is not therefore shown to have begun before December 31st of that year. This dam had a spindle section in the middle, by the removing or replacing of which the flow of water was regulated during high or low water. This spindle section and the regulation of the flow was in actual charge of one Cough. For some nine years after the completion of the dam he received his general directions from Mr. West, who was the original owner of the power and the principal stockholder in the *Appleton Water Power Company,* but the other defendants also gave him orders if they wanted any accommodations. At about the close of the nine-year period West sold to the Kimberly-Clark Company, and Mr. Charles B. Clark of that company took principal charge of the regulation of the flow and gave Mr. Cough his orders until 1888. There is no evidence showing that the defendant millowners ever directly authorized either Mr. West or Mr. Clark to act as principal manager of the dam. They seem to have volunteered to act rather than to have acted under any definite arrangement by the various millowners. The user was certainly a common user by all of the defendants. In 1879 the Atlas Paper Company became the tenant of the plaintiff at its upper dam by leasing certain amounts of water power and certain lots below the dam upon which it operated extensive mills. In 1891 it leased all of the power available at the dam. Mr. Charles B. Clark was general manager of the Atlas Paper Company during the

entire time that its leasehold interest continued. The defendant *Telulah Paper Company* built its mill in 1887 and began using water from the middle dam in 1888. Of the latter corporation Mr. Clark was also general manager.

The doctrine that a tenant cannot deny his landlord's title to the demised property during his tenancy, nor acquire a hostile title to the same while the relationship continues, is well settled. *Tondro v. Cushman,* 5 Wis. 279; *Sizer v. Clark,* 116 Wis. 534, 93 N. W. 539. The reason is that he has obtained possession by solemnly acknowledging that his landlord has title to the property leased, and hence that he is estopped by that fact from claiming that his possession of the leased property is adverse or that he has acquired a hostile and paramount title thereto.

Giving that principle its fullest weight, it does not apply here. It does not appear that the middle dam interferes in any particular with the property leased to the Atlas Paper Company prior to 1891. That property consisted only of certain lots below the plaintiff's dam, which of themselves carried no water power, coupled with a certain specified quantity of horse power of water from the dam. It nowhere appears that the property so leased was at any time or in any manner interfered with or encroached upon by the setting back of the water from the middle dam. Presumptively there was an ample supply and head of water at the dam to fill the calls of the lease, even when the water was set back by the middle dam. It is not shown, therefore, that the adverse holding by the defendants was in any way hostile or injurious to the property leased by the Atlas Paper Company.

It is further said that the defendants' dam is and was an unlawful structure because it obstructs a public navigable river without legislative authority, and hence it is argued that no right to maintain it can be acquired by prescription. This point was decided adversely to appellant's contention in the case of *Pioneer W. P. Co. v. Chandos,* 78 Wis. 526, 47 N. W.

661, where it was held that while in such a case the public right of navigation might not be barred, the rights of upper owners would be barred by failing to contest the question until the bar of the statute of limitations was complete.

No further points require attention.

*By the Court.*—Judgment affirmed.

KERWIN, J., took no part.