'ALLABY and others, Respondents, vs. MAUSTON ELECTRIC SERVICE COMPANY, Appellant.

*March 11—April 17, 1908.*

*Mills and milldams: Navigable streams: Test of navigability: Remedies of riparian proprietors: Statutes: Construction: Re-enactment of general milldam act.*

1. A stream neither meandered nor declared navigable by the legislature is *prima facie* presumed to be nonnavigable.

2. The test of navigability under the milldam acts is not the same as the test of navigability with reference to determining whether a stream is a public highway or waterway, and therefore testimony which tended merely to show that a certain stream was so capable of floating logs that the public might be entitled to a right of highway therein for that purpose was wholly insufficient to establish that it was navigable within the meaning of sec. 3374, Stats. (1898).

3. A special act of 1856 authorized the erection of a milldam in the Lemonweir river and wholly omitted any requirement of provision for navigation either by boats or logs, which is usual in milldam franchises on streams considered navigable, and the absence of which, if the streams were navigable, would be

contrary to the Ordinance of 1787 and the enabling act providing for the admission of Wisconsin. *Held*, that the act was a legislative declaration of the nonnavigability of such river.

4. The milldam acts being based upon the theory that there is a public interest in the utilization of the water power of the state to run mills sufficient to' justify the exercise of the power of eminent domain in the flooding and consequent taking of lands of individuals, a dam erected under authority of such act is lawful, and therefore is not subject to abatement in equity as a nuisance at the suit of landowners affected, such individuals being limited to the remedy provided by the statute.

5. Plaintiffs, riparian landowners, alleged the maintenance by defendant of a milldam in a nonnavigable stream in excess of the height fixed in pursuance of a special milldam act authorizing such a structure, and consequent additional flooding of plaintiffs' respective parcels of land, and prayed an abatement of and an injunction against the excessive height of the dam. *Held*, that none of the plaintiffs could maintain a suit to abate the dam or to restrain the maintenance of it at its present, or at any, height, but if it has been raised so as to flood their lands in excess of the extent already compensated they must seek their remedy in an action under ch. 146, Stats. (1898), wherein the question of the proper height necessary to the public welfare can be determined and they be compensated for the injuries to their property.

6. By the re-enactment of the general milldam law of 1857 the legislature intended to codify and revise the law regulating the multitude of dams which had been erected under special acts in the interim, except where special and peculiar provisions of individual acts are such as to exclude that inference.

7. Where there are many special acts, in the sense that they each apply to specific and individual cases generally similar, a later statute, general in its terms, will be considered general in its operation and intended to apply to all of such specific instances and to replace and supersede the specific acts. Therefore, a special milldam act of 1856 was superseded and codified by the re-enactment of the general milldam act of 1857 (ch. 146, Stats. 1898), and riparian landowners claiming additional damages by excessive height of a dam erected under an act of 1856 and seeking the abatement of and an injunction against such excessive height are limited to the remedy provided in said chapter.

SIEBECKER, J., concurs in the decision upon the ground that the mill site is devoted to public uses.

APPEAL from a judgment of the circuit court for Juneau county: J. J. FRUIT, Circuit Judge. *Reversed.*

The plaintiffs are several owners of distinct parcels of riparian land and allege that the defendant maintains a dam on the nonnavigable stream known as the Lemonweir river with no right so to do except under ch. 176, P. & L. Laws of 1856, which was enacted in the interval between the repeal and the re-enactment of what is known as the milldam act, now ch. 146, Stats. (1898). The special act was in general similar in its provisions to the milldam act, and under it the authorized height of defendant's dam was fixed by commissioners at nine feet eight and one-half inches above a datum point. The plaintiffs allege maintenance of the dam above that height and consequent additional flooding of plaintiffs' respective parcels of land, to the injury of land and crops and of their individual health conditions. The prayer is for abatement of, and injunction against, the excessive height of the dam. The injury to health, whether public or private, was not established, but some excess height of dam was found to exist, to the injury of plaintiffs' lands, and judgment was entered for abatement and injunction substantially as prayed, from which judgment defendant appeals.

*Daniel H. Grady,* for the appellant.

*Lynn S. Pease,* for the respondents.

DODGE, J. The condition of the record leaves the question of the navigability of the Lemonweir river somewhat uncertain. The complaint unambiguously alleged nonnavigability. The defendant, while admitting the maintenance of the dam under authority of the act of 1856 (P. & L. Laws of 1856, ch. 176) and various other of the facts alleged, closed its answer by a general denial which clearly was intended to meet the allegation of excessive height and of injury to the plaintiffs. It might, for some purposes, be sufficient to put in issue the navigability of the stream, although

we think a fair construction of the pleading does not justify belief in any such intent. There was no evidence offered on the subject, except that certain witnesses, as an incident in showing their familiarity with the stream and dam in early years, testified to the floatation of logs thirty-five or forty years ago. An attempt was made at the close of the trial to amend the complaint by eliminating the allegation of nonnavigability. The amendment was denied, after a colloquy between counsel and court, which also is ambiguous, but we think discloses the understanding of the court and of the parties that, on the pleadings as they then stood, there was no issue joined upon the allegation of the complaint and that the nonnavigability of the stream was taken as a conceded fact. This is confirmed by absence of any finding on the subject, although the court very carefully and intelligently declared his conclusions upon all the litigated questions of fact. For these reasons we think that we may properly consider this case, for the purposes of the appeal at least, as one relating to a nonnavigable stream.

Even if we might not assume that fact to be conceded by the pleadings, we think the evidence insufficient to establish its navigability, in the absence of any finding by the trial court. The stream is neither a meandered one nor one declared navigable by the legislature, from which results the *prima facie* presumption of nonnavigability. *Clute v. Briggs,* 22 Wis. 607. In the act of 1856 authorizing the erection of the dam are wholly wanting those requirements of provision for navigation either by boats or logs which are usual in milldam franchises on streams considered navigable, and the absence of which in this act, if the stream were navigable, would be specially surprising, since the stream connects with interstate waters and its obstruction would be in defiance of the Northwestern Ordinance of 1787 and of the act of Congress enabling Wisconsin to become a state, which by sec. 3 [Act August 6, 1846, p. 57, ch. 89] required

that all navigable waters leading into the boundary waters should be common highways and forever free. The act of 1856, therefore, is quite obviously a legislative declaration of nonnavigability. In addition to these considerations are the sworn admissions of all of the plaintiffs, several of them entirely familiar with this stream from the earliest times, that it is nonnavigable. The only evidence tending to the other conclusion is that of two or three witnesses that thirty-five or forty years ago they ran logs down this stream, some of them ultimately reaching the Mississippi river and cities on its banks.

The exact significance of the word "navigable" in this mill-dam statute (ch. 146, Stats. 1898) has never been the subject of any attempt at very accurate definition further than was decided in *Wood v. Hustis,* 17 Wis. 416, that it included both streams expressly declared navigable by statute and those which were navigable in fact. But this utterance still leaves for consideration what "navigable in fact" means in that connection. The subject is confused rather than clarified in the brief of respondents by the citation of very numerous cases in this court where were considered the rights of members of the community to fish or float logs or propel skiffs upon bodies of water where that was possible as against the riparian proprietors. As is well known, this court, in deference of what was believed public welfare, has gone to great extremes in protecting such rights in the public, and in the more recent cases has spoken of bodies of water upon which a log might be floated or a skiff propelled as navigable. This, however, was obviously a use of that term merely for purposes of brevity and not definition. It is noticeable that in the first two cases where the extreme doctrine of public rights in trifling bodies of water was discussed, the character of the stream was described not by navigability, but by the expression "public highway" or "public waterway" (*Whisler v. Wilkinson,* 22 Wis. 572, and *Sellers v. Union L. Co.* 39

Wis. 525); and the use as an equivalent for that expression of the term "navigable," as in *Olson v. Merrill,* 42 Wis. 203, was apparently inconsiderate, as has been the perpetuation of the latter word in late cases. · Obviously in that class of cases the only subject of debate and consideration was the existence of public highway rights, and it would have been promotive of accuracy in ideas had the inquiry always been whether a stream or lake were a public highway, without passing to the designation of navigability whenever that condition existed, inasmuch as navigability was made a test of other and different rights in numerous statutes both of this state and of the United States. In view of the extent to which this court has gone in declaring streams navigable in the sense that they are public highways, it is obvious that the word was used in this statute in a very different signification. Its object was to enable the utilization of water power· upon many of the important streams of the state. The ardent discussion, first of the constitutionality of the milldam act, and later of its policy, resulting in its repeal for a time, is significant of this fact. But under the decisions as to the extent of public highway rights it may be safely said that almost every stream in this state which is capable of furnishing practical water power is subject to such highway rights in the public and, therefore, would be excluded from the application of the milldam law if that were made the test of navigability under it. A stream so petty that a saw log or a skiff cannot be floated upon its waters in the manner described in *Olson v. Merrill, supra,* would certainly yield no water power of any practical value to appliances such as were common in 1840. It should be noted, too, that the extension of the conception of navigability which has resulted from the later cases had hardly dawned on the minds of legislators or courts either at the time of the passage of the statute or at the time of the decision in *Wood v. Hustis,* 17 Wis. 416. In general practice of the people the statute has been ap-

plied without question to streams wherein logs or even boats of considerable size could float.  *Clute v. Briggs,* 22 Wis. 607; *Mead v. Hein,* 28 Wis. 533; *Sabine v. Johnson,* 35 Wis. 185.  From these considerations we are constrained to the conclusion that the testimony which tended merely to show that this stream was so capable of floating logs that the public might be entitled to right of highway therein for that purpose was wholly insufficient to establish that it was navigable within the meaning of ch. 146.

It being established that the Lemonweir river is not a navigable stream at the point in question within the meaning of that term in the milldam law, then that law provides, sec. 3374, Stats. (1898): "Any person may erect and maintain a water mill and a dam to raise water for working it upon and across" that stream; sec. 3377, Stats. (1898): "Any person whose land is overflowed or otherwise injured by any such dam may obtain compensation therefor in a civil action as provided in this chapter . . . but in no other manner;" and sec. 3402, Stats. (1898): "The provisions of this chapter shall extend to . . . all cases where the owner or occupant of a mill or dam makes any material change, by raising the dam or altering the machinery or the manner of using the water, so as to cause additional damage to the land of another."  These statutes are grounded in the theory, confirmed by the courts, that there is a public interest in the utilization of the water powers of the state to run mills sufficient to justify the exercise of the power of eminent domain in the flooding and consequent taking of lands of individuals. *Fisher v. Horicon I. & Mfg. Co.* 10 Wis. 351; *Newcomb v. Smith,* 2 Pin. 131; *Pratt v. Brown,* 3 Wis. 603.  Hence that the statute is effective to render lawful the building, the maintenance, and the raising of a milldam as against the individual who suffers merely a flooding and taking of his land.  A dam so authorized which does no other damage is therefore not *per se* a nuisance, either private or public.

*Douglass v. State,* 4 Wis. 387, 390; *A. C. Conn Co. v. Little Suamico L. Mfg. Co.* 74 Wis. 652, 656, 43 N. W. 660; *Charnley v. Shawano W. P. & R. Imp. Co.* 109 Wis. 563, 568, 85 N. W. 507. The statute provides a remedy for all such damage, which, by most unambiguous language, it makes exclusive of all others, and to it the courts have therefore uniformly accorded that effect. The objection to a suit in equity to abate a dam so authorized or to enjoin its maintenance, that the remedy must be in the manner prescribed by statute, is more than a plea in abatement, as counsel seem to consider it in this case. It presents the question of the ability of any individual to bring an action to prohibit that which the legislature has declared may be done for the promotion of public welfare. Surely if the legislative behest applies to this dam, then its maintenance or raising to the extent which shall be found necessary for the public welfare is a lawful act which no court can prevent. The legislature has said that it may be maintained and no court can say it may not. The utmost right of the individual whose land is flooded or damaged is to seek compensation upon the theory of the continuance of the dam. *Fisher v. Horicon I. & Mfg. Co.* 10 Wis. 351; *Babb v. Mackey,* 10 Wis. 371, 378; *Wood v. Hustis,* 17 Wis. 416; *Crosby v. Smith,* 19 Wis. 449; *Pick v. Rubicon H. Co.* 27 Wis. 433, 439.

The language of the milldam act is general. If given its full force it applies to both the maintenance and the change of any and every dam in a nonnavigable stream. Whether an exception must be implied in case of dams whose height is expressly limited by the legislation authorizing them, of which there may be some in this state, or by express agreement with riparian owners, we need not decide. True, the present dam was originally authorized by special act of the legislature, passed, as we have seen, in the interim when there was no general law upon the subject; but that act adopted in all general aspects the policy and procedure of

the milldam, law as it existed both before and afterwards, whereby the height of the dam was fixed by a temporary tribunal locally appointed for the purpose. It was one of many generally similar acts passed in that interim period. A well-recognized rule of statutory construction is that when there are many special acts, in the sense that they each apply to specific and individual cases generally similar, a later statute, general in its terms, will be considered general in its operation and intended to apply to all of such specific instances and to replace and supersede the specific acts. *Bohlman v. G. B. & M. R. Co.* 40 Wis. 157; *Sherman v. Milwaukee, L. S. & W. R. Co.* 40 Wis. 645; *Moore v. Superior & St. C. R. Co.* 34 Wis. 173; *Geise v. Greene,* 49 Wis. 334, 341, 5 N. W. 869; *Gymnastic Asso. v. Milwaukee,* 129 Wis. 429, 109 N. W. 109. On this principle we think it clear that in the re-enactment of the general milldam law in 1857 the legislature intended to codify and revise the law which must regulate the multitude of dams which had been erected under special acts in the interim above referred to, except, of course, where special and peculiar provisions of the individual acts are such as to exclude that inference. It has been uniformly so applied. *Douglass v. State,* 4 Wis. 387; *Newell v. Smith,* 15 Wis. 101; *Bevier v. Dillingham,* 18 Wis. 529, 535; *Sabine v. Johnson,* 35 Wis. 185; *Geise v. Greene, supra.* We see no escape, therefore, from the conclusion that none of the plaintiffs can maintain a suit to abate this dam or to restrain the maintenance of it at its present, or any, height, but, if it has been raised so as to flood their lands in excess of the extent already compensated, must seek their remedy in an action under ch. 146, Stats. (1898), wherein the question of the proper height necessary to the public welfare can be determined, and they be compensated for the injuries to their property.

*By the Court.*—Judgment reversed, and cause remanded with directions to dismiss the complaint.

SIEBECKER, J. (concurring). I concur in this decision, holding that the dam may be maintained as it is, upon the ground that, under the circumstances shown, the defendant is using the mill site to maintain a grist mill, and an electric power plant devoted to public uses.