Eau Claire Dells Improvement Company and another, Appellants, vs. City of Eau Claire, Respondent.
Same, Respondents, vs. Same, Appellant.

*March 16—September 25, 1920.*

*Municipal corporations: Contracts made in proprietary capacity: Waters: City authorized by legislature to build dam and maintain waterworks: Authority to lease dam: Improvident contracts: Lease for ninety-nine years: Cost of dam not limited to bond issue authorized: Application of rentals: Estoppel of municipality to declare forfeiture: Acquiescence in breach of lease: Injunction: Nuisance.*

1. The main purpose of ch. 231, Laws 1876, was to provide a waterworks system for the city of Eau Claire (*State v. Eau Claire,* 40 Wis. 533), and in operating such system the city acts in a proprietary and not in a governmental capacity, and may, generally speaking, exercise such powers as a private concern engaged in a like business may exercise; and the city could, without direct legislative authority, contract to have another build and operate a dam for waterworks purposes, and could lease the dam and so much of the water power as the city did not need for its own purposes.

2. A city, empowered to erect a dam for waterworks purposes, which was expressly authorized to lease the excess water power and the piers, booms, and other structures erected in connection with the dam, can lease the dam itself.

3. A lease executed by a city in the exercise of its proprietary capacity to operate a waterworks system, which protected the public purposes of the city, is not invalid, though it subsequently appear that it may have been improvident; nor is the lease invalid because it was to extend for a term of ninety-nine years.

4. Sec. 9, ch. 231, Laws 1876, authorizing an issue of municipal bonds to a stated amount for the construction of the works authorized by the act, is construed not to limit the expenditure for the erection of such works to that amount, so that the

municipality was not prohibited from leasing to a corpora-
tion which constructed a dam the surplus power in payment
for such construction; in addition to delivering to the cor-
poration bonds in practically the full amount limited.

5. A lease of the dam and surplus power by the city does not vio-
late sec. 10, ch. 231, Laws 1876, requiring money received
from the lease of water power to be applied to keeping the
works in repair, payment of interest on the bonds, and for
the creation of a sinking fund for the redemption thereof,
where the lease reserved only a nominal rental, but required
the lessee to construct and maintain the dam.

6. Waiver is the voluntary relinquishment of a known right and
may be a defense though no detriment to the adverse party is
shown; but in estoppel the existence of the truth of the fact
complained of is not denied, but the right of the other party ·
to complain thereof is denied because his previous ·conduct
has caused the party asserting the estoppel to change his posi-
tion in such a way that loss to him would result ·if the estop-
pel were not interposed. Conduct may be positive or nega-
tive, so that silence, where it is a duty to speak, may consti-
tute an estoppel *in pais.*

7. A city may be estopped to declare a forfeiture of a contract
for acts which it encouraged, even though such acts were a
violation of state laws, since the estoppel is not urged as
authority for violation of the ·law, but merely against the
city's contract right to declare a forfeiture.

8. Where the contractual rights of the parties spring from a pro-
prietary and not from a governmental exercise of municipal
power, estoppel can be urged against the municipality on the
same grounds and sustained by the same proof that is ·essen-
tial against a private person.

9. Where the evidence and the findings of the court disclose that
the navigability of the stream is not affected, and no person
has suffered damage, certain acts of the plaintiff in relation
to the dam, although without legislative sanction, are not un-
lawful, and do not *per se* constitute a nuisance.

10. Where a city had leased to a corporation the dam and surplus ·
water power, acquiesced in the building of a mill over the
lock required to be maintained by the lease, and not only
agreed, but required, the lessee to maintain flash-boards rais-
ing the water above the specified height, it could not enforce
a· forfeiture of the lease because of those violations after
they had continued for more than twenty years.

11. In an action to restrain the forfeiture of a lease because the
city was estopped from declaring a forfeiture for acts in
violation thereof, the decree should not restrain the city from

influencing state officials to interfere with such use of the property, since, if the use was lawful, no interference will be presumed, and if it was unlawful the attention of officials should be called thereto.

12. Provisions in the decree enjoining the city from forfeiting the lease for acts it was estopped to question so long as the state did not compel the discontinuance of the acts, were objectionable as permitting a forfeiture by the city for past acts in case the state should declare them unlawful, and should be modified to permit forfeiture only for the continuance of the acts after they were declared unlawful.

APPEALS from a judgment of the circuit court for Eau Claire county: A. H. REID, Judge. *Modified and affirmed.*

Action to restrain the city of *Eau Claire* from declaring a forfeiture under a contract for the construction and lease of a dam and water power across the Chippewa river at *Eau Claire,* entered into between the city and the *Eau Claire Dells Improvement Company,* hereinafter called the *Improvement Company,* February 17, 1877, and to declare the rights of the city and of plaintiffs under said contract. The answer and cross-complaint of the city asked for a dismissal of the complaint upon the merits; that the contract referred to be declared illegal, and that plaintiffs and all parties claiming under them be held to have forfeited any rights they may have had under such contract in case it should be held to have been valid in its inception, and that the city be declared to be the owner and entitled to possession of the dam, water power, lands, and works connected therewith.

Only so much of the facts as are essential to an understanding of the material determinative questions in the case on appeal will be set out. The printed case consists of five volumes of about 500 pages each, and the findings of fact and conclusions of law cover over forty printed pages. The trial necessarily took a wide scope and many questions presented to the trial court are not here for review, and of those pressed upon us many are eliminated by the decision of those questions that ultimately control the case.

In 1876 the city of *Eau Claire,* being desirous of obtaining water power for municipal waterworks, secured the passage of ch. 231, Laws 1876, empowering the city to build a dam not to exceed sixteen feet in height across the Chippewa river. The act authorized the city "to pass and adopt all such ordinances, resolutions and orders as may be necessary or proper to construct, maintain, operate and regulate such waterworks, . . . and for the purpose of operating the same, to apply such portion of the water power created by said dam as may be necessary." "To erect, construct and maintain . . . such piers, booms, and other structures, as shall be sufficient for protecting and preserving the navigability of said river, so far as the same may be rendered necessary by reason of the construction and maintenance of the dam and works." "To let, lease, and rent any surplus water power . . . for manufacturing or other purposes;" and to "let, lease and rent any of the piers, booms or other structures which may be constructed . . . for any use or purpose which shall not materially obstruct the navigability of said river, or interfere with the successful operation and maintenance of the dam and works . . . and may fix the rents for water power." The act also provided that the dam "shall be constructed so as not to materially obstruct the navigation of said river, and shall contain a lock of sufficient capacity to safely and expeditiously pass steamboats and rafts of lumber, . . . and there shall also be constructed and maintained in said dam, separate and sufficient chutes and slides for the safe and convenient passage of logs," etc. There was also a provision that "all moneys which shall be received for the lease of water power . . . water rents, piers and booms . . . shall be applied to the purpose of keeping said works in repair, payment of the interest upon the bonds issued for the construction thereof, and for creating a sinking fund for the ultimate redemption thereof." By ch. 181, Laws 1880, it was provided that in the event the council leased the booms and structures the lessees might fix

the rents for water power. Ch. 6, Laws 1885, authorized the dam to be built to a head of eighteen feet, and ch. 263, Laws 1880, empowered the city to grant the privilege to any person or corporation to build for themselves and own such waterworks and to maintain and operate the same and to grant to such corporation the right "to use the dam and other necessary works herein authorized, so as to supply the said city and the inhabitants thereof with water."

The city, being financially unable to build a dam, entered into a contract with the *Improvement Company* whereby the latter agreed, among other things, to build the dam and lock with such piers and other structures above and below the dam as will preserve the navigability of the river so far as the same may be rendered necessary by the construction of the dam and works; to install water-wheels and machinery at the east end of the dam for waterworks purposes, and to reimburse the city for all sums paid for the dam site and flowage which the city was to acquire and for all sums the city may have to pay as damages by reason of the construction and maintenance of the dam and lock. Upon the faithful performance by the *Improvement Company* of the foregoing covenants, which were declared to be conditions precedent, the city agreed to let, lease, and rent to the *Improvement Company* for ninety-nine years, for the purpose of manufacturing, etc., . . . all the right, title, and interest of the city in and to all the water power .. . . created by said dam and not immediately and continuously needed to propel the water-wheels to operate the waterworks or to preserve the navigability of the river; also the said dam, piers, booms, and other structures, excepting and reserving the water-wheels, shafts, and attachments to be used for waterworks purposes and a sufficient amount of water to operate the same, together with all right, title, and interest of the city then or thereafter in and to the lands occupied by the works, reservoir, and race (except such as was needed for waterworks purposes), etc., which lease (when made) shall con-

tain the following covenants, conditions, and agreements on the part of the *Improvement Company,* its successors and assigns: (1) To use the leased property so as not to materially obstruct the navigability of the river; (2) to maintain and keep in good repair the dam, lock, piers, and other structures for the full term of ninety-nine years; (3) to operate during the said term the said dam and lock and other structures leased in such a manner as not to materially obstruct navigation, and so that the successful operation of the waterworks, dam, race, and other works shall not be interfered with; (4) to operate and pass through the lock all steamboats, rafts of lumber, and to pass and drive down said river and over the dam all sawlogs, etc., designed for points below the dam; (5) to furnish the city where its water-wheels are located sufficient water to operate its waterworks and to operate said water-wheels and furnish sufficient power for the city's waterworks purposes; (6) to maintain and operate all of said works constructed by it in strict accordance as the same are authorized to be maintained and operated by the city by the act of the legislature and not otherwise; (7) to reimburse the city for ninety-nine years for all money it is called upon to pay by reason of the maintenance or operation of the dam, race, lock, and other works; (8) to pay all taxes during the term of ninety-nine years lawfully assessed or levied upon the property and rights to be leased; (9) to pay $1 per year as rental on the 1st day of July of each year; and (10) upon the expiration of the term to deliver up the leased property in good condition and repair.

The contract also provided

"that in case of the nonpayment of said rent, whenever and as fast as it becomes due, or in case of the noncompliance with said conditions precedent, or in case of the nonperformance, by said second party, of any of the covenants or agreements hereinbefore contained, on its part to be performed, then, in that case, the said city of *Eau Claire,* its attorney or assigns, shall, after giving thirty days' notice of such de-

fault to said second party or any of its principal officers, if such default then continues, have the full right to vacate this lease, and declare all the provisions, terms, and conditions thereof null and void; whereupon the said lessees shall yield up to the said lessor, its attorney, agent or assigns, full, quiet, peaceable and immediate possession of the said premises and rights hereby leased, anything herein contained to the contrary notwithstanding."

No lease as provided for in the contract was ever entered into by the parties, both having treated the contract as a lease.

The *Improvement Company* constructed the dam and works as required by the legislative act and the contract at a total expense of about $300,000, and has operated the same since, leasing part of the power to its co-plaintiff and to some other defendants in the case. No member of the common council or other city officer was directly or indirectly interested in the contract of 1877 or in the *Improvement Company.*

In periods of high water a few commercial boats, prior to 1877, navigated the Chippewa river as far as Chippewa Falls, about ten miles in a direct line above *Eau Claire,* but all such navigation above *Eau Claire* ceased as early as 1877 and was never afterwards resumed and is not practicable. No boat has ever applied to be locked through at the dam after its construction except one owned by the *Improvement Company* and used on its own pond above the dam.

From 1877 to 1886 the river at the dam was used for floating rafts of lumber down stream, but all such rafting ceased about 1886. Large quantities of logs and timber products have been floated down stream from an early day, but such floating had practically ceased at the time this action was begun in 1906.

Soon after the construction of the dam the *Improvement Company* began to use flash-boards in periods of low water, first thirty inches in height and later to a greater height, for

purposes of better handling and sorting logs in the pond and floating them below. In 1894 it increased the height and maintained them throughout the whole year, such increase being gradual, until a height of eight feet was reached in about 1900, at which height they have since been maintained. They can easily be removed and do not endanger the dam or property below it. The *Dells Paper & Pulp Company* is a lessee of the plaintiff, and in the winter of 1895-1896 it built, with the knowledge and consent of many members of the common council and board of public works, a pulp mill at a cost of over $100,000 on the site of the lock in the dam and has maintained it there ever since, preventing the passage of boats through it, if any there were. A boat hoist or marine railway would better answer the purpose for the passage of boats now upon the river should any be needed. Owing to the action of the current in the river, it was found desirable to change the location of the log chute from the place provided in the contract. Such change facilitated the handling of logs.

With the exception of the commencement of this action, and one in 1899 that was shortly afterwards voluntarily dismissed by the city, it has never questioned the validity of the contract of 1877, and in reliance upon it the *Improvement Company* and its lessees, in addition to the cost of the dam, have expended over half a million dollars in improvements, the value of which is almost wholly dependent upon the maintenance and operation of the dam as used at the time of the commencement of the action, the water-wheels and power developed being dependent upon a twenty-six foot head. Neither the removal of the flash-boards nor the opening of the lock would be of any benefit to the city or to any one and would greatly injure the property of plaintiffs and their lessees. The removal of the flash-boards would injuriously affect the waterworks of the city by rendering a complete reconstruction thereof necessary if the head were reduced to eighteen feet. In 1905 the city joined with the

plaintiffs in an effort to secure legislative permission to maintain a dam of thirty-two feet, and since the city has acquired ownership of its waterworks system in 1909 its superintendent has insisted upon the maintenance of the head produced by the flash-boards in order to properly operate the city's water-power plant. The loss by a reduction of the head to eighteen feet would total hundreds of thousands of dollars to the parties interested in the water power.

As to the changes made by the flash-boards and the closing up of the lock, the plaintiff and its lessees acted in the belief that the city consented to and encouraged such action; that it was beneficial to the public and not contrary to the best interests of either the city or the state, and that neither would ever object to the same. The *Improvement Company* has always maintained sufficient slides and chutes for all logs and forest products and other craft and has always freely and expeditiously passed them over the dam.

Except as to increasing the head of the water by the use of flash-boards, utilizing the lock for mill purposes, and converting the old slide formerly existing on the west side of said lock into a flume, the *Improvement Company* has made no changes in the construction or plan of the dam otherwise than from time to time to reinforce and strengthen it.

Some of the defendants are creditors of some of the lessees of power, and the property rights in question constitute a substantial portion of their security for the payment of the bonds held by them.

In August, 1906, the city served notice upon the *Improvement Company* claiming it was in default because the dam was maintained at an excessive height; that it had been changed so as to obstruct navigation; that the lock had been converted to private use; that sufficient chutes for the passage of timber products had not been maintained, and other defaults not material upon the appeal; that if these alleged defaults continued for more than thirty days after notice the city would exercise its right under the contract of 1877 to

declare a forfeiture. To prevent the declaration of any forfeiture and to establish the rights of the parties under the contract this action was begun.

The conclusions of law of the trial court were to the effect: (1) The contract between the *Improvement Company* and the city, dated February 17, 1877, was and is a valid and subsisting· contract. (2) The non-execution of the lease provided for in the contract does not affect the rights of the parties; they stand in the same relation they would have stood had the lease been executed. (3) The acts of the *Improvement Company* and the *Dells Paper & Pulp Company* in increasing the head of water created by the dam by the use of flash-boards on its crest, and in closing the lock and log chute by constructing a pulp mill in and over the lock, and using such chute for a flume, were in violation of the terms of the contract of 1877, and, if unexcused, constituted breaches of such contract. (4) The rights of the city to enforce forfeiture under said contract because of the acts of the plaintiffs mentioned in the next preceding finding have all been waived by the city and it has become estopped from complaining of any such acts. (5) That, relying upon such waiver by the city, plaintiffs and other lessees have expended large sums of money, the investment of which would be largely lost if the city should be permitted to enforce the conditions of the contract, and "said city is estopped from complaining of the closing of the lock or closing of the log chute or of the use on the dam of flash-boards of the height of eight feet, *so long as to each of said practices as the state shall not actually compel the discontinuance of the flash-boards and the opening of said lock and log chute,* and from declaring or attempting to declare the rights of either of the plaintiffs or of the Chippewa Valley Railway, Light & Power Company, or the rights of those claiming under or through either of said companies, forfeited because of any breaches of the terms of said contract hereinbefore mentioned." (6) The plaintiffs and the defendant Chippewa

Valley Railway, Light & Power Company are entitled to a judgment enjoining the city of *Eau Claire* from complaining of the use of flash-boards of the height of eight feet, from complaining of the use of the lock for pulp-mill purposes, and from in any manner interfering with any such uses, *and from inducing or influencing state officials or any other persons to complain of or to interfere with such uses,* and from declaring said contract of February 17, 1877, void, and from attempting to so declare, and from declaring any of the rights of either of the plaintiffs or of the Chippewa Valley Railway, Light & Power Company under said contract forfeited for or on account of the continuance of such use of flash-boards, such use of the lock, or such use of the log chute, *so long as to each of said uses as the state shall not actually compel the discontinuance of the same.*

(7) "The plaintiff *Eau Claire Dells Improvement Company* and its tenants are entitled to the possession and use of the dam described in the complaint and of the accumulation of water impounded thereby for the full term of ninety-nine years provided for by said contract of February 17, 1877, but subject to the provisions of said contract in so far as the same has not been waived or said city become estopped from claiming the right to enforce the same as hereinbefore found, and the plaintiffs and the defendant Chippewa Valley Railway, Light & Power Company are entitled to a judgment enjoining the city of *Eau Claire* from taking possession of said dam, accumulation of water, improvements or works, and from in any manner interfering with the same or with the exercise of the rights of the plaintiff *Eau Claire Dells Improvement Company* or its tenants in respect thereto for or on account of any alleged breaches of said contract involved in this action or the continuance thereof as hereinbefore set forth."

From a judgment entered accordingly, and dismissing the city's cross-complaint, the city appealed, and the plaintiffs appealed from those portions of the judgment set out in italics in conclusions (5) and (6) above.

For the plaintiffs there was a brief by *C. T. Bundy* and

*P. M. Beach,* both of Eau Claire, and oral argument by *Mr. Bundy.*

· *John B. Fleming,* corporation counsel, and *A. H. Shoemaker,* both of Eau Claire, attorneys, and *Harry L. Butler* of Madison, of counsel, for the defendant.

The following opinion was filed July 17, 1920:

VINJE, J.　The city has twelve assignments of error, but they may all be grouped into three main divisions, as many of them relate to the question of estoppel or waiver, and others become immaterial if the facts found by the trial court are sustained. We shall spend no time discussing the attack upon the findings of fact further than to state they are well sustained by the evidence and must stand as verities in treating the legal questions arising therefrom.

The city claims the trial court erred in finding and adjudging (1) that the contract of 1877 was and is a valid and subsisting contract; (2) that the city has waived the right to enforce and has become estopped to assert the forfeiture clause of the contract, if valid; and (3) in restraining the city from inducing or influencing state officials or inducing or influencing any other persons to complain of or interfere with the uses of the dam sanctioned by the court.

In spite of the fact that the city executed the contract, which both parties agree was tantamount to the execution of a lease as therein provided, over forty years ago, has received the rent thereunder and all the benefits of the contract for that period, it now seeks to invalidate it and receive the further benefits of acquiring the dam and all the water-power properties connected therewith free of charge because it did not have the legal capacity to execute the contract. This claim, though highly repellent to a court of equity, must nevertheless be met as a question of law. · It is claimed there is no authority given the city to lease the dam itself; that the provision in sec. 3 authorizing the city to lease any surplus water power for manufacturing pur-

poses and to "let, lease, and rent any of the piers, booms, or other structures which may be constructed or erected under the provisions of this act," does not include the dam. Plaintiffs argue that the dam is a structure and is therefore specifically included in the term "other structures." They also claim that there is no necessity for direct legislative authority to lease the dam, and this claim appeals more strongly to us. The main purpose of ch. 231, Laws 1876, was to provide a waterworks system for the city. *State v. Eau Claire,* 40 Wis. 533. In operating a waterworks system a city acts in a proprietary and not in a governmental capacity. *Piper v. Madison,* 140 Wis. 311, 122 N. W. 730; *State Journal P. Co. v. Madison,* 148 Wis. 396, 134 N. W. 909; *Nemet v. Kenosha,* 169 Wis. 379, 172 N. W. 711. Acting in a proprietary capacity it may, generally speaking, exercise such powers as a private concern engaged in a like business may exercise; for in their business matters municipal corporations are governed by very much the same rules as private corporations. *Schneider v. Menasha,* 118 Wis. 298, 305, 95 N. W. 94; *Omaha W. Co. v. Omaha,* 147 Fed. 1, 77 C. C. A. 267, 12 L. R. A. N. s. 736; *Biddeford v. Yates,* 104 Me. 506, 72 Atl. 335; *Little Falls E. & W. Co. v. Little Falls,* 102 Fed. 663. Therefore, wholly irrespective of direct legislative authority, the city could contract to have another do that which it could do in its proprietary capacity; namely, build and operate the dam for waterworks purposes. Not having the funds itself, it could lawfully contract with the *Improvement Company* to furnish the same and secure the latter for its reimbursement by a lease of the dam and so much of the water power as the city did not need for its purposes.

It was specially authorized to lease the excess water power for manufacturing purposes. This provision of the act was no doubt induced by the fact that such leasing, except as an incident to a municipal purpose, is not within the scope of a municipality. *Attorney General v. Eau Claire,* 37 Wis. 400.

So, also, special provision was made for authority to lease such piers, booms, and other structures as shall be sufficient for protecting and preserving the navigability of the river. If the dam was constructed, these would be a necessary incident thereto in order to preserve the public right of navigation, and so special grant to transmit the discharge of such public duties to lessees was secured. It follows that no duties devolving upon the city have been unlawfully delegated to the *Improvement Company,* and that it had authority to lease the dam.

It is next urged that the city had no right to lease the dam for ninety-nine years and thus to deprive itself of the use of the excess water power and other rights incident to the operation and control of the dam. Two considerations minimize the effect of this claim. The first is that, as already pointed out, only proprietary and not public rights are parted with; and the second and main one is that the chief purpose of the authority given the city to build and maintain the dam was to enable it to operate a municipal waterworks system. This purpose the contract carefully guards by reserving to the city so much water power as may be necessary to operate its waterworks. Since its waterworks system was installed it has had such power. No complaint is made and sustained that sufficient power has not been furnished it in the past or that it will not be furnished in future. This being the main purpose and this having been secured, and being made safe by the forfeiture clause in the contract, it is not so material what becomes of the incidents of the legislative grant, namely, the use of the excess power. It may be from the present viewpoint, more than forty years after the contract has been in effect, that it could be said the city made an improvident contract. But it cannot be said that good judgment would have so pronounced at the time it was made. But be that as it may, it was entered into in good faith, without fraud, in furtherance of the legislative purpose, and in a proprietary capacity.

In such capacity it is deemed competent for a municipality as well as for a private individual to make a valid improvident contract.

While leases for ninety-nine years were not common in this state, or perhaps in the United States, at the time this lease was made, they have become much more so and have uniformly been sustained so far as mere duration of time is concerned. Our court held that trustees could make a valid lease for ninety-nine years though it far exceeded the trust period and was tantamount to a conveyance so far as the remainderman was concerned. *Upham v. Plankinton,* 152 Wis. 275, 140 N. W. 5. In *Bailey v. Philadelphia,* 184 Pa. St. 594, 39 Atl. 494, a city's lease of its gas plant for a long term of years was upheld, and in *Little Falls E. & W. Co. v. Little Falls,* 102 Fed. 663, a lease of thirty years for supplying the city with water was sustained.

Sec. 9 of the act of 1876 provides that the common council of the city of *Eau Claire* "may issue the bonds of said city for the purpose of constructing the waterworks authorized by this act, not exceeding one hundred thousand dollars in amount, at such times as it may determine." The city did issue bonds in the amount of $95,000 which it turned over to the *Improvement Company* as part payment for the construction of the dam and which netted the *Improvement Company* $81,000. It is argued it was the legislative intent that the total expenditure by the city in cash or otherwise was limited to $100,000, and since the amount of the bonds given the *Improvement Company* plus the value of the excess power for ninety-nine years greatly exceeded $100,000, the city has passed the limit fixed by the legislature for the construction of the dam. In view of the actual situation confronting the city and the legislature, it is not reasonable to believe that it was the legislative intent that no more than $100,000 should be spent in building the dam. The dam and works necessarily connected therewith to preserve navigation cost approximately $300,000. It was built

by the *Improvement Company* for itself shortly after the act was passed, and there is no evidence that such cost was not a necessary and reasonable one. In view of that, we think the legislative intent was to limit the bonded indebtedness of the city on account of the dam to $100,000, but not to limit the cost of the dam to such sum.

Sec. 10 of the act of 1876 provides that "All moneys which shall be received for the lease of water-power flowage, . . . water rents, piers and booms, and any other source or sources arising from any of the works authorized by this act, shall be applied to the purpose of keeping said works in repair, payment of the interest upon the bonds . . . and for creating a sinking fund for the ultimate redemption thereof." The contract, it is claimed, violates this provision of the act because it does not produce the revenue contemplated and that which is produced is not applied to the uses prescribed. It must be admitted that the language of the section is more compatible with a situation where the city operates the dam than with one where it leases it. But it is not inconsistent with a lease thereof. In so far as the rentals from the dam and works are concerned, they go to keep the same in repair, for that is a duty charged upon the *Improvement Company* by the contract. If the city has not applied water rents to the required purpose that is no concern of plaintiffs and cannot, therefore, invalidate their contract with the city, for they have nothing to do with the application of the water rentals. If the city has failed to apply them as the act provides, it cannot charge its default up to plaintiffs.

The last attack made upon the contract is that certain aldermen who voted for the contract were interested in the *Improvement Company*. The court found this not to be the fact, and the evidence sustains the finding and that disposes of the question.

Perhaps the stress of the case rests upon the question whether the trial court erred in finding that the city by its

conduct had waived the forfeiture clause as to breaches already incurred and was estopped from asserting the same. It is conceded by the plaintiffs that the raising of the dam eight feet by the use of flash-boards, the closing up of the chute, and the use of the lock for a paper mill, constituted a breach of the contract, but it is claimed the city has waived such breach, and that owing to the reliance of plaintiffs upon such waiver and other conduct of the city and the irreparable injury that would now result to plaintiffs by reason of having expended large sums of money on the strength of the city's conduct and waiver, the city is estopped from asserting the forfeiture clause of the contract. Waiver is generally defined as the voluntary relinquishment of a known right, and it may be a defense though no detriment to the adverse party is shown. In estoppel *in pais* the element of loss or detriment to the adverse party must appear. In asserting an estoppel the existence of the truth of the fact complained of is not denied, but the right of the other party to complain thereof is denied because the previous conduct of such party has caused the party asserting the estoppel in good faith to change his position in such a way that loss would ensue to him if the estoppel cannot be effectively interposed. Conduct may be positive or negative. Thus silence, where there is a duty to speak, may constitute an estoppel *in pais*. 10 Ruling Case Law, 706. So, also, the fact that some one else may have a right to complain is immaterial. The question is, Can the party against whom the estoppel is asserted complain? In the case at bar the conduct of the city for many years was relied upon by plaintiffs, and because of such conduct they made valuable improvements that would inure to the benefit of the city if its position is well taken. It would therefore seem to be a case where estoppel rather than waiver or acquiescence covers the whole case. In other words, if the conclusions of the trial court are correct, the city by its conduct induced plaint-

iffs to change their position to their loss unless such conduct can be asserted by way of estoppel.

The gist of the argument of the city is to the effect that, since the acts complained of were forbidden by the legislative enactment authorizing the city to build the dam, the city by waiver or conduct could not validate such acts; that they were and remain invalid in spite of anything the city said or did or can say or do now. They were prohibited by the legislature, therefore the city had no power to authorize them in the first instance, and. having no power to authorize them, it has no power to ratify them because the power to ratify presumes the power to perform the act ratified. If estoppel cannot be successfully asserted by plaintiffs unless they can justify their acts under the law of 1876, then the logic is good. But the estoppel invoked has no relation to the legislative act. It rests upon the contract made between the parties. Such contract could have been made without a forfeiture clause at all. In that event no forfeiture could be asserted by the city, though it might perhaps be by the state. But the state is not a party to this action, and no right that it may have in reference to the subject matter can be affected by the decision herein. The estoppel invoked is against the contract provision and not against the legislative franchise. The gravamen of plaintiffs' case is to restrain the city from enforcing the forfeiture clause of the contract because of its conduct. And the sole question now for decision is, Has the city estopped itself from enforcing the forfeiture feature of its contract? As to that it is immaterial, as before stated, that some one else may have a right to complain. In solving this question the same rules and principles apply that would apply if all the acts complained of were lawful but were within the forfeiture clause. Plaintiffs are not seeking to have their acts legalized by or through the conduct of the city, for this they cannot do. But they are saying to the city that, Be our acts lawful or

unlawful, you have no right to complain thereof, because you have not only silently acquiesced therein with knowledge of all the facts, but you have actively encouraged and permitted us to make these valuable improvements, and you are therefore estopped to forfeit the contract through conduct permitted and encouraged by you and resulting indirectly to your benefit through building up your city as a manufacturing center and adding hundreds of thousands of dollars to your tax roll.

Upon the former appeal (134 Wis. 548, 115 N. W. 155) it was decided that the assertion of the forfeiture rested upon contractual rights between the parties. Bearing this in mind, and bearing in mind that the contractual rights spring from a proprietary and not from a governmental exercise of municipal power, it follows that estoppel can be urged against the city upon the same grounds and sustained by the same proof that is essential against a private person. *Kneeland v. Gilman,* 24 Wis. 39; *Houfe v. Fulton,* 34 Wis. 608; *Lawrence v. American W. P. Co.* 144 Wis. 556, 128 N. W. 440; *Beadles v. Smyser,* 209 U. S. 393, 28 Sup. Ct. 522, 52 L. Ed. 849; *Fredonia v. Fredonia N. G. L. Co.* 84 Misc. 150, 145 N. Y. Supp. 820; 19 Ruling Case Law, 1002 *et seq.* In *Houfe v. Fulton,* 34 Wis. 608, 618, the court said concerning a municipal corporation:

"It is now well settled that as to matters within the scope of their powers and the powers of their officers, such corporations may be estopped upon the same principles and under the same circumstances as natural persons."

This was said in a case where a town was held estopped to deny the existence of a highway and related, therefore, to a governmental function. Whether this doctrine has been limited by *Ashland v. C. & N. W. R. Co.* 105 Wis. 398, 81 N. W. 1101, by requiring clearer proof of estoppel in case of the exercise of governmental powers, need not now be discussed, for it is certain that it has not been limited as to

estoppel against municipal corporations in the exercise of their proprietary powers.

It should also be borne in mind that under the evidence in this case and the facts found by the court to the effect that the navigability of the Chippewa river has not been materially affected or diminished by the acts of plaintiffs, nor has any person suffered damage thereby, such acts are not unlawful and do not *per se* constitute a nuisance though without legislative permission. *A. C. Conn Co. v. Little Suamico L. M. Co.* 74 Wis. 652, 43 N. W. 660; *Charnley v. Shawano W. P. & R. I. Co.* 109 Wis. 563, 85 N. W. 507; *Allaby v. Mauston E. S. Co.* 135 Wis. 345, 116 N. W. 4.

Bearing these principles and facts in mind, let us briefly examine the salient conduct of the city tending to sustain the finding of estoppel. First and foremost is the fact that every change made by plaintiffs in the use of the dam was known to the city at the time or shortly after it was made, and no protest was made until about 1905 or 1906, some ten years after the last radical change was made by closing up the lock and building the pulp mill therein. The building of such mill, the court finds, was done by reason of the consent and encouragement of individual aldermen and the unofficial action of the common council. The flash-boards had been maintained for over twenty years and at the present height for a number of years before this action was begun; and since 1909 the city's waterworks superintendent had insisted upon having a head of twenty-six feet, which could be had only by the use of flash-boards, as the city well knew. The evidence also discloses at least fourteen acts or declarations of the common council or of the mayor encouraging the development of the water power of the dam; the giving of bonuses aggregating over $50,000 to factories using power; the giving of bonuses to factory employees; the remission of taxes on manufacturing plants using power from the dam. These acts and declarations began as early as

1880 and continued until 1896. The city had also in 1905 joined with the plaintiffs in attempting to secure legislation permitting a thirty-two foot head, thus evincing the fact that it was interested in and desired the use of all the power that could be developed from the dam.

In view of the fact that the uses complained of have not affected the navigability of the river for such purposes as it is practically navigable; that they have not injured the city or third parties; that the city, from the very inception of the completion of the dam until a short time before this action was begun, not only silently permitted the uses complained of but actively encouraged them; that in reliance upon such permission and encouragement by the city plaintiffs have in good faith spent hundreds of thousands of dollars in improvements that would inure to the benefit of the city if it could insist upon the forfeiture, it is deemed that the trial court reached the correct conclusion when it restrained the city from now enforcing the forfeiture.

The court also enjoined the city "from inducing or influencing state officials or any other persons to complain of or interfere with such uses," referring to the use of eight-foot flash-boards, the use of the lock for pulp-mill purposes, and the closing up of the log chute. In so doing we think the court erred, not perhaps because of lack of power so to do, but because not essential to the protection of plaintiffs' rights and because of a needlessly harsh inhibition upon public officials. If the facts be as the court found them and as we deem them to be from the evidence, the uses complained of do not harm the state or any one. If they do not in fact harm the state, it is not to be assumed that it will arbitrarily destroy valuable property belonging to its citizens and from which it and its municipalities derive substantial taxes just because technically it may have the power so to do—a question not here decided. This court will assume that if the state is ever called upon to act in this mat-

ter it will not only act lawfully but also equitably as to all parties concerned. On the other hand, if it can be shown that the uses complained of are detrimental to the state, then the privilege, if not the duty, of any citizen to call such detrimental uses to the attention of the state should not be withheld.

Upon the city's appeal the amended judgment is modified by striking out from paragraph 12 thereof the words "and from inducing or influencing state officials or any other persons to complain of or to interfere with such uses," and as so modified is affirmed.

The plaintiffs appeal from that part of the judgment found in paragraphs 11 and 12 estopping the city from complaining of the uses therein mentioned *"so long as to each of said practices as the state shall not actually compel the discontinuance of the flash-boards and the opening of said lock and log chute,"* as expressed in paragraph 11, and *"so long as to each of said uses as the state shall not actually compel the discontinuance of the same,"* as expressed in paragraph 12 thereof, because it limited the binding effect of the estoppel to the time when the state may successfully act, thus permitting the city, in that event, to enforce a forfeiture for past breaches. We think the court erred in so limiting the effect of the estoppel, and the paragraphs above quoted will be stricken out and the following paragraph inserted in the place of each: "provided, however, that in the event the state can and shall hereafter lawfully direct or require the discontinuance of such uses, or any of them, then the injunction herein granted shall not be held to restrain the city of *Eau Claire* from declaring a forfeiture in case they or any of them are continued beyond the time then lawfully fixed for their discontinuance." This will protect plaintiffs against a forfeiture for all breaches prior to the time fixed by the state, if it can and shall lawfully fix a time, for a change in the use of the dam and works, and will leave

the city in a position to protect its interests as they may here-inafter be affected by state action.   As so modified the judgment is affirmed.

*By the Court.*—Judgment modified as expressed in the opinion herein, and as so modified is affirmed, with costs to plaintiffs.

A motion for a rehearing was denied, with $25 costs, on September 25, 1920.