CHICAGO, ST. PAUL, MINNEAPOLIS & OMAHA RAILWAY
    COMPANY, Appellant, vs. CITY OF BLACK RIVER
    FALLS, Respondent.

*May 5—October 11, 1927.*

*Municipal corporations: Furnishing electricity to citizens: Propri-*
    *etary capacity: Contract permitting extension of lines over*
    *railroad right of way: Formalities of execution: Ratification*
    *by common council.*

1. A city engaged in its proprietary capacity may exercise such
    powers as a private concern engaged in a like business exer-
    cises, and may act in a dual capacity, the one being govern-
    mental in its nature and the other proprietary.   p. 582.
2. Where a city engages in the project of furnishing electric light,
    power, or water for the benefit of its inhabitants upon a con-
    sideration to be paid for such service, the function so per-
    formed is proprietary and not governmental.   p. 582.
3. In determining the validity of a contract between a city and a
    railway company whereby the city was permitted to extend its
    electric light plant over the right of way of the railway and
    assumed the obligation to hold the railway harmless for all
    damages resulting from such extension, sec. 925—95, Stats.
    1898, as amended by ch. 135, Laws of 1901, and sec. 925—96,
    Stats. 1898, providing for the operation and management
    of the plant by the board of public works and city council,
    have no application.   p. 583.
4. Under said secs. 925—95 and 925—96 as amended, the powers
    to be exercised by the city council in legislating with refer-
    ence to the waterworks or lighting plant are matters of a
    governmental nature, such as the determination of the ques-
    tion whether the city shall venture into the field of public
    utilities by construction or purchase.   p. 583.
5. The extension by the city of electric wires over the railway
    right of way could only be made upon obtaining a lease,
    a license, or an easement from the railway company by
    contract, by donation, or by the exercise of the power of
    eminent domain.   p. 584.
6. Where the municipal officers executed such extension contract
    and filed it in the city clerk's office, the construction of the
    extension by the city and use thereof for sixteen years in
    full view of the public without contesting the validity of
    the contract, showed knowledge of the contract by the gov-

erning officers and council of the city as well as the public
at large and constituted a complete ratification of the con-
tract.  pp. 585, 586.

7. Such contract was not *ultra vires* or one which the munici-
pality could not enter into under any circumstances, or one
which required competitive bidding, and was not required to
be countersigned by the city comptroller under sec. 925—45,
Stats., as a condition precedent to the incurring of liability
on the part of the city.  p. 586.

APPEAL from a judgment of the circuit court for Jack-
son county: E. W. CROSBY, Circuit Judge. *Reversed, with
directions.*

The defendant is a city of the fourth class, operating un-
der the general charter law of this state.   In 1910 it con-
cluded to and actually did reconstruct its electric plant, and
extended it over the right of way of the plaintiff.   While the
matter of the extension was before the council and discussed
by that body, the city clerk was informally requested to ne-
gotiate with the plaintiff for the purpose of ascertaining
what would be necessary to acquire the consent of the rail-
way company to such extension.   An official communication,
signed by the clerk, was thereupon forwarded to the head-
quarters of the road, which met with the response that such
privilege would be granted upon the usual terms, which con-
sisted of the assumption of an obligation on the part of the
city to hold the road harmless from all damages which it
might suffer by reason of such extension.   The city was also
notified, in a number of communications, not to enter upon
the construction of the extension until the proposed contract
was fully executed.

The contract, in duplicate, was then prepared by the road,
signed by its proper officers, and transmitted to the clerk,
but no action was taken by the city for several months and
until shortly before the end of the year, at which time the
contract was executed by the city through its proper officers,
viz. the mayor and the city clerk, whereupon a duplicate
original was delivered to the officers of the road and the

Chicago, St. P., M. & O. R. Co. v. Black River Falls, 193 Wis. 579.

other duplicate retained by the clerk and filed by him in his office.

Thereafter the city constructed the extension under the supervision of an expert hired for that purpose, and such extension, after an inspection on the part of the road, was approved by it. The records of the common council disclose that no formal action was ever taken by that body, although it appears that the matter was considerably discussed by the members informally.

The plaintiff was under the workmen's compensation act, and in 1926 one of its employees, while engaged in the performance of service on the right of way, took hold of a broken-down electric wire containing a powerful voltage of electricity, which resulted in a fatal accident; and the matter having been brought before the industrial commission, the widow of the deceased was awarded compensation. An appeal having been taken from this award, the circuit court for Dane county affirmed the same. In the proceedings before the industrial commission and on the appeal, the plaintiff duly tendered the defense to the defendant, which tenders were not accepted, but refused; whereupon the plaintiff commenced the present action, relying upon the terms of the contract for a reimbursement of the amount paid as compensation, the claim having been duly presented to and disallowed by the city.

The city's defense was based upon two grounds: first, that no legal, binding contract had ever been entered into, and that said contract was never ratified by the proper city authorities; and second, that the accident was not the result of the extension of this electric system over plaintiff's right of way. The lower court concluded that the contract in question was not formally adopted by the common council of the city and that the city never ratified such contract, and thereupon dismissed the complaint, with costs; and judgment having been entered accordingly, the plaintiff has prosecuted this appeal,

For the appellant the cause was submitted on the brief of *Bundy, Beach. & Holland* of Eau Claire, attorneys, and *R. L. Kennedy* of St. Paul, of counsel.

For the respondent there was a brief by *Perry & Perry* of Black River Falls, and oral argument by *H. M. Perry.*

The following opinion was filed June 20, 1927:

DOERFLER, J.    Where a city engages in a project such as the furnishing of electric light, power, or water for the benefit of its inhabitants, upon a consideration to be paid for such service, the function so performed by the municipality is proprietary and not governmental. *Eau Claire Dells Imp. Co. v. Eau Claire,* 172 Wis. 240, 179 N. W. 2; *Milwaukee v. Raulf,* 164 Wis. 172, 159 N. W. 819; *West Bend v. West Bend H. & L. Co.* 186 Wis. 184, 202 N. W. 350.    Ordinarily a city engaged in its proprietary capacity "may exercise such powers as a private concern engaged in a like business exercises." *Eau Claire Dells Imp. Co. v. Eau Claire, supra.*    A municipality, therefore, may act in a dual capacity, the one being governmental in its nature and the other proprietary.

The learned circuit court arrived at the conclusion that the contract in question was illegally entered into and void, as being in violation of the provisions of sec. 925—95 of the Statutes of 1898 as amended by ch. 135 of the Laws of 1901, and sec. 925—96, Stats. 1898.    Sec. 925—95, as amended, reads as follows:

"In cities which own a lighting plant or waterworks, or both, such lighting plant or waterworks, or both, may be operated under the direction of the board of public works or by a commission, to be determined by ordinance of the common council, to consist of the mayor, three citizens, and one alderman to be appointed by the mayor."

Sec. 925—96, Stats. 1898, reads as follows:

"The council shall have power to legislate on all matters with reference to the construction, purchase, operation, man-

Chicago, St. P., M. & O. R. Co. v. Black River Falls, 193 Wis. 579.

agement and protection of waterworks or lighting works for the city, not contravening the provisions of this chapter, the constitution or laws of the state; provided, that all provisions relating to such works, except as herein otherwise provided, shall be adopted by a vote of not less than three fourths of all its members."

Under the facts in this case sec. 925—95 has no applicability. Sec. 925—96 in its language is rather broad and comprehensive, but it is doubtful, to say the least, whether it has any bearing upon the vital question involved in the determination of the validity of the contract executed. It refers to the power of the council to legislate with reference to the subject included in the wording of the statute. Under its provisions the municipal council may exercise the defined powers only by a vote of not less than three fourths of all its members. This would be rather persuasive that the legislature had in mind important and broad policies of a governmental nature, such as a determination of whether the city shall venture into the field of public utilities by construction or purchase, a subject of vast importance to all of its inhabitants. That this may be deemed a proper construction of sec. 925—96 is indicated by the language used in *Milwaukee v. Raulf, supra,* where it is said:

"In its capacity as a governmental agency the city is charged with the duty of determining the necessity and the extent and general character of all public improvements, including . . . lighting works, waterworks and other public works and of providing for their construction and maintenance."

In speaking of the proprietary powers of a municipality the opinion continues:

"And on its proprietary side it lets contracts for the erection and construction of all public works and carries on many activities of a kind which in a general way resemble those of a private corporation, although everything inures to the benefit of the people."

The learned circuit court also held that the contract was

invalid and imposed no liability upon the city, whether it be deemed one executed in the exercise of a governmental function or exercised in a proprietary capacity of the city; that every one is under obligation to take notice of the extent of the power of the city to contract, and also of the authority of an officer or agent of the city to execute contracts in its behalf; that both the mayor and the city clerk were not authorized by proper proceedings to execute this contract on behalf of the city; and that the officers and representatives of the railway company must be presumed to know the extent of the power and authority of these city officers. Furthermore, it was held that the contract was never ratified by the city; that in order to ratify the same, action is required by the council, as provided by the statutes above referred to; and that the acts and conduct of the city officials were not such, after the construction of the extension, as to amount to a ratification.

It appears from the undisputed evidence in the case that the council never took formal action on the subject of this contract. Without determining the necessity of formal action by the council in the first place, we will assume (but not decide) that such formal action was necessary, and then proceed to the consideration of the question of ratification.

The city did not enter into a contract for the reconstruction of its electric light system or of the extension. It proceeded to perform the work and to furnish the materials necessary, itself, under the supervision and superintendence of an expert hired for that purpose. The extension over the railway right of way could only be constructed upon obtaining a lease, a license, or an easement from the company. A privilege in one of these forms was absolutely essential, as the railway right of way separated the eastern and western portions of the city. This permission could be obtained by contract, by donation, or by the exercise of the power of eminent domain. The attention of the council while in

regular session was expressly directed by the superintendent in charge to the necessity of obtaining some form of permission, and the matter was there discussed, although no formal action was taken in the matter either at that time or thereafter. The city clerk was requested to communicate with the company for the purpose of ascertaining what might be necessary to obtain such permission. As appears from the statement of facts, communications covering a period of several months passed between the city clerk and the representatives of the railway company. From these communications it may be gathered that the railway company was under the impression, and was justified in believing, that due authorization had been extended by the council to the executive officer and clerk of the city. The contract purports to be executed by the city through its proper officers. It was insisted by the railway company that the work of extension be not commenced until everything necessary in the premises had been complied with. The communications from the railway company were received by the clerk in his official capacity, and filed, and the contract, when finally executed by the city, was also filed in the city clerk's office and a duplicate original delivered to the company. The contract contained a sketch or plat indicating the point of the extension and the placing of poles upon the right of way. The work was done and the materials furnished by the city, and the bills therefor were duly audited and paid. The construction was open and notorious and in full view of the public at large. For a period of about sixteen years the city received the benefit of the provisions of the contract, and no claim with reference to the validity thereof was raised until shortly prior to the commencement of this action. No claim is made that the railway company in any way derived a profit or benefit out of the construction of this extension; on the contrary, the extension was a decided detriment to it; but, realizing the necessity of such extension, it tendered this con-

tract, which grants permission for such an extension under the usual terms.

Under these circumstances a valuable privilege was extended under the contract to the city, the benefit of which the municipality accepted. The contract in its terms was extremely just and equitable. Neither the officers of the city nor the public at large had any reason to expect that the railway company would assume an obligation which rightfully belonged to the city; for, had this extension not been constructed, it would have been impossible for the accident referred to to happen, assuming that the occurrence took place as is claimed by the railway company. Under these circumstances the finding of the court that the members of the council and the public at large did not have knowledge of the contract is clearly untenable; on the contrary, a careful perusal of the record, and a consideration of the surrounding facts and circumstances, fastens upon our minds the irresistible conclusion, not only that the mayor and clerk were familiar with the terms of the contract, but that the members of the governing body and the public at large were aware thereof. We are therefore of the opinion that a complete ratification has resulted. *Kneeland v. Gilman,* 24 Wis. 39; *Athearn v. Independent School Dist.* 33 Iowa, 105; *Peterson v. Mayor,* 17 N. Y. 449. See, also, cases cited and digested in L. R. A. 1915 A, 1033, 1034.

The contract in question was not an *ultra vires* contract. It was not one which the municipality could not enter into under any circumstances. It was not one which required competition among bidders; nor was it a contract which the comptroller, under the provisions of sec. 925—45 of the Statutes, was obliged to countersign and approve as a condition precedent to the incurring of liability on the part of the city. Sec. 925—45, in speaking of the duties of the comptroller, reads as follows: "He shall countersign all contracts made with the city if the necessary funds shall have been provided to pay the liability that may be incurred thereunder,

and no such contract shall be valid until so countersigned."
That provision evidently refers to liquidated liabilities based
on contract, and not such a liability as is involved herein.

The possibility of a liability on the part of the city, on
account of an accident like the one herein referred to, was
extremely remote.   Such an accident might never occur, nor
could any one anticipate the damages, or the extent thereof,
to the railway company or to any other person.   Such dam-
ages resulting from the extension of the lighting works
might range between $1 or less and $100,000 or more.   No
appropriation could therefore be made in advance which
could meet every possible situation.

The city, in addition to its defense based upon the alleged
invalidity of the contract and the further claim that there
was no ratification, also took the position that the accident
did not result from the extension of the city's electric light-
ing system across the right of way of the railway company.
Evidence appears in the record upon that subject.   The court
evidently deemed it unnecessary, in view of its decision, to
determine this question.   While the judgment of the lower
court must be reversed, the cause will be remanded for fur-
ther proceedings, to decide the undetermined issue.

*By the Court.*—The judgment of the lower court is re-
versed, and the cause is remanded with directions for a new
trial as indicated herein.

On October 11, 1927, a motion by the appellant to amend
the mandate was granted and the following opinion filed:

PER CURIAM.   It now appears to the satisfaction of the
court that the sole issue upon the trial in the circuit court
consisted of a question of law involving the validity of the
contract.   Both parties at the close of the evidence unreserv-
edly moved for a direction for judgment, and the court ex-
pressly held that no issue of fact was involved.   Upon fur-
ther consideration we agree with the view thus expressed by

the lower court, and under these circumstances it becomes necessary to modify the opinion and the mandate accordingly.   The mandate when so modified shall read:

"The judgment of the lower court is reversed, and the cause is remanded with directions to enter judgment in favor of the plaintiff and against the defendant as prayed for in plaintiff's complaint."

It is so ordered.